# Illinois Official Reports

## Appellate Court

---

### *Bailey v. Mercy Hospital & Medical Center*, 2020 IL App (1st) 182702

---

| | |
|---|---|
| Appellate Court Caption | JILL M. BAILEY, Individually and as Independent Representative of the Estate of Jill J. Milton-Hampton, Deceased, Plaintiff-Appellant, v. MERCY HOSPITAL AND MEDICAL CENTER, an Illinois Corporation; SCOTT A. HEINRICH, M.D.; BRETT M. JONES, M.D.; AMIT ARWINDEKAR, M.D.; HELENE CONNOLLY, M.D.; TARA ANDERSON; and EMERGENCY MEDICINE PHYSICIANS OF CHICAGO, LLC, Defendants-Appellees. |
| District & No. | First District, Sixth Division<br>No. 1-18-2702 |
| Filed<br>Rehearing denied | September 30, 2020<br>November 9, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 2013-L-8501; the Hon. Thomas V. Lyons II, Judge, presiding. |
| Judgment | Affirmed in part and reversed and remanded in part. |
| Counsel on Appeal | Vivian Tarver-Varnado, of AMB Law Group, LLC, and Robert Allen Strelecky, both of Chicago, for appellant.<br><br>Patricia S. Kocour, Catherine Basque Weiler, and Elizabeth Bruer, of Swanson Martin & Bell, LLP, of Chicago, for appellees Mercy Hospital & Medical Center and Tara Anderson. |

Michael T. Walsh and Nicholas J. Alsaka, of Kitch, Drutchas, Wagner, Valittuti & Sherbrook, of Chicago, for other appellees.

Panel                   JUSTICE CONNORS delivered the judgment of the court, with opinion.
Justices Cunningham and Harris concurred in the judgment and opinion.

## OPINION

¶ 1       Plaintiff, Jill M. Bailey, independent administrator of the estate of Jill M. Milton-Hampton, deceased, appeals the jury's verdict that found against plaintiff and for defendants Mercy Hospital and Medical Center (Mercy); Scott A. Heinrich, M.D.; Brett M. Jones, M.D.; Amit Arwindekar, M.D.; Helene Connolly, M.D.; Tara Anderson, RN; and Emergency Medicine Physicians of Chicago, LLC (EMP).

¶ 2       On appeal, plaintiff contends the trial court deprived her of a right to a fair trial when it denied her requests to give Illinois Pattern Jury Instructions, Civil, No. 105.07.01 (2011) (hereinafter IPI Civil No. 105.07.01), which is the instruction on informed consent, and IPI Civil (2011) No. 5.01, which is the instruction on missing evidence. She argues the trial court abused its discretion and denied her a fair trial when it denied her request to give a nonpattern jury instruction on the loss of chance doctrine. She claims she was denied a fair trial when the court permitted Dr. Arthur Reingold, who was unqualified, to testify and allowed defendant Mercy's expert, Dr. Gary Schaer, to testify about a demonstrative exhibit that was unsupported and misleading. Plaintiff lastly asserts that the jury's verdict was against the manifest weight of the evidence.

¶ 3       The trial court erred when it refused to give IPI Civil No. 105.07.01 and a nonpattern jury instruction on the loss of chance doctrine. The trial court did not err when it refused to give IPI Civil No. 5.01, permitted defendants' expert, Dr. Arthur Reingold, to testify, and allowed defendants' expert to testify about a demonstrative exhibit.

¶ 4                               I. BACKGROUND

¶ 5       This is a medical malpractice case involving Jill M. Milton-Hampton (Jill) who died on March 18, 2012, after she sought treatment in the emergency department at Mercy during the evenings of March 16, 2012, and March 17, 2012. Plaintiff filed a civil complaint against certain physicians and nurses who cared for Jill when she was in the emergency department at Mercy. Plaintiff asserted claims for medical negligence and wrongful death, alleging that defendants failed to timely diagnose and treat her for sepsis or toxic shock syndrome. Some physicians and nurses who were originally involved in the litigation were voluntarily dismissed before trial. Plaintiff proceeded at trial against Heinrich, Jones, Arwindekar, Connolly, Anderson, Mercy, and EMP. Plaintiff's theory against Mercy was that the physicians—Heinrich, Jones, Arwindekar, and Connolly—were apparent agents of Mercy and that one of the nurses involved in her care—Anderson—was an agent of Mercy. Plaintiff's theory against

EMP was that the physicians were agents of EMP. The jury returned a verdict in favor of all defendants and against plaintiff.

¶ 6                                     A. Defendants and Litigation

¶ 7        Defendants Heinrich, Jones, Connolly, and Arwindekar were the physicians who cared for Jill in the emergency room. They were employees of EMP, which had a contract with Mercy to provide emergency medicine services. Anderson was an employee of Mercy and was Jill's nurse during Jill's second visit to the emergency room.

¶ 8        At trial, the parties disputed Jill's cause of death. Plaintiff's theory was that Jill died of toxic shock syndrome and sepsis caused by a retained tampon, which could have been treated with antibiotics. Defendants' theory was that Jill died of acute viral myocarditis, which could not be treated with antibiotics. Each party presented experts supporting its respective theory.

¶ 9        Heinrich, Jones, Connolly, and Arwindekar testified about their roles in the case. Each physician testified that he or she complied with the standard of care. Each physician also testified that Jill did not have sepsis or toxic shock syndrome. The facts below about Jill's visits at Mercy are taken from the testimonies of the treaters who cared for Jill at Mercy.

¶ 10                                    B. Mercy's Emergency Room

¶ 11        In March 2012, when a patient arrived at the emergency department at Mercy, the patient would first inform the person at the registration desk of her chief complaint. If the complaint was anything other than chest pain, a triage nurse would evaluate the patient, which would include taking vitals and determining the patient's acuity level, or "ESI classification." The ESI classification system used a scale from one to five, with a level one being used for patients with the most urgent needs. The triage area was staffed by nurses. During certain times of the day, a "physician in triage" would work with the triage nurses to expedite the process. The physician in triage initiated certain tests and took care of the patients who had minor complaints. The physician in triage did not see every patient and did not diagnose patients. The physician in the main emergency department performed the comprehensive physical examination on the patient.

¶ 12                                    C. First Visit to the Emergency Room

¶ 13        Jill, who was a 42-year-old woman, first arrived in the emergency department at Mercy at about 6:45 p.m. on March 16, 2012. She was evaluated by a triage nurse and complained of abdominal pain, nausea, vomiting, and diarrhea. She had experienced the abdominal pain for the last four days, and she had recently recovered from experiencing flu-like symptoms, including sore throat, chills, and fevers. The triage nurse noted that Jill had tachycardia, or an elevated heart rate, but did not have a fever and her respiratory rate was normal. The physician in triage ordered a comprehensive metabolic panel (CMP), a pregnancy test, and a urinalysis. After the initial assessment by the triage nurse, Jill waited in the waiting room. Around 11 p.m., Jill was sent back to the main emergency department, where she was seen by Heinrich.

¶ 14        Heinrich performed a physical evaluation on Jill, who complained of nausea, vomiting, diarrhea, and abdominal pain. Jill did not have a fever, chest pain, or shortness of breath. Her heart rate was elevated at 124. The normal resting heart rate for a woman Jill's age was between 60 and 100. Her systolic blood pressure was 96. The normal range was 90 to 140. Her skin was

warm and dry, which meant she was not perfusing. Jill had no neurological deficits, and there was nothing unusual with her face, scalp, neck, eyes, ear, nose, or throat.

¶ 15    The CMP results showed that Jill's glucose and liver function were normal. Her blood urea nitrogen, glomerular filtration rate, and creatine, which assess kidney function, were also normal. Jill's sodium and chloride levels were a little low but were consistent with a patient who was dehydrated. Heinrich ordered a hemoglobin and hematocrit test to evaluate Jill's blood count and determine if she was anemic. The results showed that Jill's hemoglobin was low at 7.5L, which could be a result of chronic anemia, as she was currently menstruating and had a history of heavy periods. According to Mercy's parameters, a normal hemoglobin level for Jill would have been 12 to 15 mg/dl.

¶ 16    Heinrich ordered three bags of intravenous fluids to help with Jill's dehydration. He also ordered medicine for her nausea, epigastric discomfort, and pain. At about 3:40 a.m., Heinrich evaluated Jill and prepared a note to transfer her care to Jones. He indicated in his note that Jill still complained of nausea but was starting to feel better. He also noted that Jill's blood count was low, which was likely due to menstruation. At that time, Heinrich did not have a definitive diagnosis but believed Jill had gastroenteritis, or a stomach flu most commonly caused by a virus. He saw a patient with gastroenteritis during every shift. His conclusion that Jill had gastroenteritis was based on his physical examination, the results of the CMP, Jill's symptoms, and the fact that she had started to feel better after receiving the fluids. Jill did not have a fever or rash, which, according to Heinrich, were cardinal signs of toxic shock syndrome. Heinrich did not think Jill had toxic shock syndrome that led to bacterial sepsis or shock.

¶ 17    At about 3:30 a.m. on March 17, 2012, Heinrich transferred Jill's care to Jones. During the transfer of care process, Heinrich and Jones discussed Jill's history, the tests that had been ordered, and the "running diagnosis" of gastroenteritis. Jones reviewed Heinrich's notes, which indicated that Jill had responded to the fluids and medicine. When Jones took over Jill's care, she was receiving her third bag of fluids. Jones's plan was to continue the treatment to see how Jill responded. The urinalysis results, which returned when Jones was caring for Jill, were negative for a urinary tract infection and showed no signs of dehydration. Her respiratory rate was high at times, and her hemoglobin was low, which was consistent with chronic anemia. Her chloride was a little bit low, which was consistent with having symptoms of diarrhea and vomiting. After Jill received the fluids, her elevated heart rate improved, and she told Jones she felt better. Based on Jill's lab results and response to fluids, Jones believed that Jill had viral gastroenteritis.

¶ 18    Jones evaluated Jill around 6 a.m. He recommended that Jill be admitted to the hospital for observation and further testing because he needed more information and was concerned Jill could have something else. Jill declined admission. Jones's discharge note stated:

> "I did see and evaluate the patient. She continues to be nauseated. I recommended further observation and admission, especially given her persistent nausea, persistent tachycardia, abnormal laboratory studies, however, the patient declines this and would really like to go home. [S]he, does demonstrate decisional capacity. *** She agrees to return to the ER for worsening symptoms, severe pain, or for any other concerns. Her partner is with her, appears to be reliable and will bring her back for worsening pain."

¶ 19    Jones testified about the conversation he had with Jill before she left the hospital. Jill's ex-husband and Jill's nurse, Mary Kotan, were present for the conversation. Jones testified that he outlined the risks of Jill leaving, including that he was concerned she had gastroenteritis

- 4 -

and an elevated heart rate. He explained that there was something else going on that they needed to figure out and there were "multiple possibilities that this could be[,] many of which are very, very serious." Jones told Jill that he wanted her to return to the hospital if she experienced worsening symptoms.

¶ 20     Jones also testified about his concerns about Jill's condition when she left the hospital. Jones was concerned that Jill's hemoglobin level was 7.5 mg/dl, but he believed it was a result of chronic anemia. He testified that "I think that's what it was, but with one value and no prior values, I don't know what to make out of that. Could she have heavy bleeding, internal bleeding, [gastrointestinal (GI)] bleeding? It is possible. So that was concerning to me." Jones did not take any steps to determine why Jill's hemoglobin was low.

¶ 21     Jones was also concerned that Jill had persistent tachycardia, or an elevated heart rate, when she left. He would have expected her heart rate to return to normal after she received three liters of fluid. He testified that persistent tachycardia "throws up red flags for any emergency physician," such as pulmonary embolism, a blood clot in the lungs, gastrointestinal bleeding, or an infection. Jones also testified that sepsis was one of the "main possibilities" he was concerned about with Jill. He did not order tests with respect to determining whether she had a pulmonary embolism or sepsis. He never told Jill that he was concerned about a blood clot in her lungs, gastrointestinal bleeding, or sepsis, and he did not document these concerns in the record. He testified that these conditions could be life-threatening and could not recall whether he told Jill that she had a life-threatening condition. During the time Jones cared for Jill, he did not order any tests.

¶ 22                              D. Second Visit to the Emergency Room

¶ 23     When Heinrich returned to Mercy on March 17, 2012, he reviewed Jill's chart and learned that she had refused admission. Heinrich called Jill and spoke with her ex-husband, who told Heinrich that Jill was not doing better and was returning to the emergency room. Heinrich called Connolly, who was the triage physician in the emergency department, and informed her that Jill had previously been in the emergency department with abdominal pain and was returning with symptoms of nausea, vomiting, and diarrhea. He advised Connolly that she should order a computed tomography (CT) scan of the abdomen.

¶ 24     Jill arrived at the emergency department at 5:49 p.m. on March 17, 2012. When Connolly saw Jill's name appear in the system, she ordered a CT of the abdomen, a complete blood count (CBC), and a CMP. She did not order a chest X-ray or electrocardiogram (EKG). Connolly did not evaluate Jill, participate in her triage, or review her records. Jill complained to the triage nurse that she had a cough, vomiting, diarrhea, shortness of breath, and chest pain. The record regarding Jill's complaint in triage stated: "Seen in Mercy ER. Released at 6:00 a.m. Cough, vomiting, diarrhea, shortness of breath, chest pain." Jill rated her abdominal pain a 10 out of 10, which was the worst possible pain, and her chest pain an 8 out of 10. Jill's heart rate was 116. Her blood pressure was 90 over 53, which was low for diastolic blood pressure. Her respiratory rate was 20, and her skin was warm and dry. The triage nurse testified that Jill did not have an imminent cardiac need and that she rated Jill's ESI classification, or acuity level, a three out of five, which meant she believed Jill could wait in the waiting room for an open bed and Jill's condition was not likely to deteriorate. Connolly, as the physician in triage, never received a call about any concerns with Jill and did not request that Jill be sent back to the main room. Jill did not go back to the main emergency department until about four hours later.

Connolly agreed that, if Jones suspected Jill had sepsis or a gastrointestinal bleed, it would have been inappropriate for her to wait in the waiting room for four hours.

¶ 25    At about 9:43 p.m. on March 17, 2012, Tara Anderson, who was Jill's primary emergency room nurse, took an initial assessment on Jill in the main emergency department. Anderson indicated in her initial assessment note that Jill was alert and oriented and had symptoms of vomiting and cramping. Her skin, which was warm and dry, and respiratory patten were normal. Jill did not complain of chest pain or shortness of breath. Anderson testified that she had no reason to believe that she did not do her job and act as a nurse and advocate for Jill. Anderson's role as a nurse was to carry out a physician's orders.

¶ 26    Marco Rodriguez, an emergency medicine resident, and Arwindekar, an attending physician, cared for Jill when she was in the main emergency room. A few minutes after Anderson's evaluation, Rodriguez performed a history and physical evaluation on Jill, who complained of nausea, vomiting, and diarrhea. She did not have a fever, chest pain, or shortness of breath. According to Rodriguez, pain with urination and blood in the urine could be signs of an infection, and Jill did not have these symptoms. Jill did not have a rash, and her skin was warm and dry. She was tachycardic but did not have any other abnormalities with respect to her heart. Her respiratory rate was normal, and she was alert and oriented. Jill's white blood cell count was 12.2, which, according to Arwindekar, was very minimally elevated and could be caused by stress, including traumatic injury, infection, or dehydration. The neutrophils in Jill's white blood count were not elevated, suggesting that she did not have an acute infection. Jill's hemoglobin level was 7.2, which had dropped a small amount from the first visit and was consistent with chronic anemia.

¶ 27    At 10:03 p.m., Rodriguez ordered intravenous fluids and medicine for nausea and for pain. He ordered a chest X-ray for her cough. At 12:07 a.m. on March 18, 2012, Rodriguez re-examined Jill, stating in his note that her pain and nausea improved and her condition was stable. Based on Rodriguez's physical examination and Jill's history, Rodriquez suspected Jill had a virus and did not suspect that she had sepsis. Rodriguez was unaware that Jones had been concerned that Jill could have had sepsis or a pulmonary embolism. If he had been aware, his care and treatment for Jill would not have changed. Rodriguez left his shift around midnight and transferred Jill's care to his attending physician, Arwindekar.

¶ 28    At about 12:54 a.m. on March 18, 2012, Jill had a CT scan for "abdominal pain," and the report indicated that her clinical indication for the test was "persistent abdominal pain, shortness of breath and vomiting." The results of the CT scan showed no signs of abdominal bleeding but indicated there was a "heterogenous density" in the vagina area, "which should be correlated clinically." According to Arwindekar, the "heterogenous density" noted in the CT report indicated Jill had blood clots, not a tampon, as blood clots would be consistent with a woman who is menstruating. He did not take any measures to determine whether there was a tampon present in Jill.

¶ 29    At 1:59 a.m., Anderson documented that Jill's pulse, blood pressure, temperature, and respiratory rate were normal. Around 2:37 a.m., Arwindekar placed an order to transfer Jill to the observation unit, a floor outside of the intensive care unit for patients expected to be discharged within 24 to 48 hours. At this time, Jill's tachycardia, or elevated heart rate, had improved, her vital signs were normal, her condition was stable, and she did not have a fever. She was still nauseous and continued to have diarrhea. Based on Jill's response to fluids and

vital signs, Arwindekar believed Jill's condition was consistent with viral gastroenteritis. During the time Arwindekar cared for Jill, she was never pain-free.

¶ 30    At 4:30 a.m., Jill was transferred to the observation unit in stable condition with normal vital signs. Dr. Shanu Gupta, the hospitalist who cared for Jill in the observation unit, concluded that Jill had gastroenteritis. At about 5:50 a.m., Jill went into cardiopulmonary arrest and received antibiotics. Jill was intubated, and the health care providers engaged in "aggressive efforts" to resuscitate her. Jill was resuscitated, after which she was transferred to the intensive care unit where she continued to suffer cardiopulmonary arrest and "coded" eight times. Jill died at 11:30 a.m.

¶ 31    At some point when Jill was in the intensive care unit, a hematologist, Dr. Subramanian, was called to consult with the physicians caring for Jill. Subramanian noted in the record that Jill's code was due to "peripheral smear most compatible with DIC [disseminated intravascular coagulation] due to sepsis and shock." Subramanian did not testify at trial. During the same time when Jill was coding, Dr. Deepa Dharanipragada ordered blood cultures to be drawn. Dharanipragada did not testify at trial. The record does not contain any report on the blood cultures, and as explained below, according to one of defendants' experts, the medical records showed the order was "discontinued," meaning it was not completed.

¶ 32    Cook County medical examiner Lauren M. Woertz prepared a report of postmortem examination. Woertz's report indicated that Jill had intravascular access catheters in the left side of her neck and anterior aspect of her right wrist, drainage tubes from the right and left sides of her chest, a central line in the left groin, and orogastric and endotracheal tubes from the oral cavity. Woertz's report listed 11 different conditions under the category "diagnoses," including myocarditis and methicillin-resistant staphylococcus aureus (MRSA) sepsis. Woertz's report indicated that the blood samples were submitted for analysis, and the toxicology blood cultures showed that MRSA was present in Jill's blood. According to Woertz's report, Jill's cause of death was due to myocarditis resulting from sepsis. James Bryant performed a second autopsy at the request of Jill's family. He concluded that Jill's cause of death was acute and chronic congestive heart failure due to dilated cardiomyopathy. Bryant's report did not indicate that Jill had myocarditis or sepsis. Woertz and Bryant did not testify at trial.

¶ 33    Plaintiff's counsel asked Heinrich whether he knew why the billing records showed that Mercy billed Jill's health insurance, Aetna Insurance, for "septicemia, shock, and sepsis"; Heinrich responded that he did not know, as he did not do billing. The record contained Mercy's claim to Aetna Health, Inc., which listed numerous "diagnose codes," including "septicemia NOS," "shock NOS," and "sepsis NOS."

¶ 34                                    E. Plaintiff's Case

¶ 35    As previously discussed, plaintiff's theory was that Jill died of bacterial sepsis caused by toxic shock syndrome due to a retained tampon. The experts testified about sepsis and toxic shock syndrome. Sepsis is a body's response to an untreated infection and causes systemic inflammation, an elevated heart rate, damage to organs, and pain. MRSA is a common pathogen that can cause toxic shock syndrome. MRSA can be caused from tampon use.

¶ 36    Plaintiff argued that the "heterogenous density" in the CT report was a tampon, which was the source of Jill's infection, and that Woertz's report indicating that MSRA grew from the postmortem toxicology blood sample supported her theory that Jill had a bacterial infection

leading to sepsis. Plaintiff argued Jill would have survived had the physicians timely administered antibiotics.

¶ 37                                    F. Plaintiff's Experts

¶ 38        Dr. Michael D'Ambrosio, an emergency medicine physician, testified that Jill's cause of death was untreated sepsis. When Jill initially presented to the emergency department, her symptoms were consistent with viral gastroenteritis. However, after she received the first or second liter of fluids, her symptoms should have improved. Because her symptoms did not improve, Heinrich and Jones should have suspected that she had an infection and should have ordered additional testing and done a "sepsis workup" to look for sepsis, which would include a lactic acid test, blood and urine cultures, a CT scan, an EKG, and chest X-ray. They violated the standard of care when they did not do so.

¶ 39        D'Ambrosio testified that, with respect to Arwindekar, he should have taken note that the CT results showed fluid in her lungs, as that could indicate an infection. He testified that the standard of care required admitting Jill to a higher level of intensive care unit rather than the observation unit. He deviated from the standard of care when he did not order a sepsis workup. With respect to Connolly, when Jill returned to the emergency room with the same symptoms from her first visit as well as with chest pain and shortness of breath, Connolly should have brought Jill back to the main emergency room and ordered additional testing, including tests to look for sepsis. She should have ordered a chest X-ray and EKG, if the triage nurse had not already done so. Connolly deviated from the standard of care when she did not do so.

¶ 40        Ambrosio testified about the standard of care required for Jones with respect to his conversation with Jill before she left the hospital. When a patient wants to leave the hospital, the physician must inform the patient of his concerns about the patient leaving the hospital. The physician must do the necessary tests so that the patient has complete information about her decision to leave the hospital. He testified that, "[t]o have informed consent, you have to have done the necessary tests, if the patient gave you sufficient time to do them, to give them a good decision to make." Jones did not complete the necessary tests to give Jill adequate information. Had Jones completed the necessary testing, he could have informed Jill of his concerns. Jones should have told Jill that she had a blood infection and required antibiotics and that she could die if she left the hospital before she received treatment. He testified that sepsis "kills people" and the antibiotics treatment is "very time sensitive."

¶ 41        Dr. Michael Noto, a specialist in pulmonary critical care and infectious disease medicine, testified that Jill had toxic shock syndrome that led to bacterial sepsis. Sepsis can present with a history of fever, sore throat, congestion, nausea, abdominal pain, vomiting, and diarrhea. The patient has a better outcome if sepsis is treated early with antibiotics. Because the physicians did not diagnose her with sepsis or administer early treatment of antibiotics, Jill's risk of dying increased.

¶ 42        Noto further testified that, when Jill presented to the emergency room on March 16, 2012, she met the criteria for sepsis. Her history of symptoms that had resolved before she presented to the emergency room, including fevers, sore throat, abdominal pain, and vomiting, supported Noto's opinion that she had an infection. He testified that a fever is "very common" with toxic shock syndrome and that the presence of a rash can be helpful in the diagnosis. The fact that Jill did not have a documented fever or rash did not exclude a diagnosis of toxic shock syndrome, as a fever and rash could have been present at the onset of the illness before she

came to the hospital. The results of Jill's chest X-ray, which were available at 1 a.m. on March 18, 2012, were consistent with Jill having sepsis. During Jill's second visit, her white blood cell count was "abnormally high" and increased during the course of her condition, suggesting her body was responding to an infection. Noto testified that a tampon caused Jill's infection, which was identified as the "heterogeneous density" in the CT report. Noto testified that the MRSA finding from the postmortem blood sample in Woertz's report was unlikely a contaminant. He acknowledged that there was no specific source of a bacterial infection other than the MRSA finding from Woertz's blood sample.

¶ 43    Dr. Harry Jacob, an internal medicine physician specializing in hematology and oncology, testified that Jill died from sepsis and toxic shock syndrome. He testified that her history of symptoms several days before she came into the hospital, including vomiting, chills, fever, and abdominal pain, were consistent with a patient who had ongoing worsening sepsis. When Jill presented to the emergency room, she had an elevated heart rate, which was one of the major signs of a patient who had shock due to sepsis. She also had low blood pressure, nausea, vomiting, and abdominal pain, which were also symptoms consistent with toxic shock syndrome. Jill's elevated white blood count, fluid identified in the CT report, and heterogenous density finding in the CT report, which he identified as a tampon and the site of infection, supported his opinion that she had toxic shock and sepsis. The physicians should have considered toxic shock syndrome because Jill was menstruating and toxic shock can be caused by bacteria from a tampon. Jill would have survived if she received the proper course of treatment for sepsis.

¶ 44    Dr. Michael C. Fishbein, a pathologist, testified that Jill died of multiorgan failure due to shock from sepsis, which was caused by bacterial MRSA. He concluded that Jill's clinical course of her condition was consistent with bacterial sepsis. His opinion was based on the presence of a tampon identified as the heterogenous density in the CT report, which was the source of the infection, and the MRSA finding from Woertz's autopsy report. He testified MRSA is not a common postmortem contaminant and the MRSA finding from Woertz's postmortem toxicology blood sample was a true, positive culture. He agreed that the autopsies did not show there was any bacteria in Jill's body other than the MRSA blood culture. He acknowledged that, if there was no positive MRSA blood culture and the heterogenous density was not a tampon, he did not know the source of infection and would not be able to conclude that Jill had bacterial sepsis.

¶ 45    Dr. Hilton Hudson, a cardiothoracic surgeon, testified that Jill died of sepsis. Jill's history of fever before she presented to the hospital and her symptoms in the hospital of chest pain, abdominal pain, nausea, and an elevated heart rate were consistent with sepsis. If Jill had been treated with antibiotics and been taken to the intensive care unit earlier, she would have survived. He testified that hospital-acquired MRSA was a common problem, as MRSA can enter the body when tubes and catheters are inserted. Woertz's autopsy report concluded that Jill died of myocarditis secondary to sepsis. Her conclusion was based on the MRSA culture performed after she died. Hudson acknowledged that the second autopsy performed by Bryant concluded that Jill died of cardiomyopathy, which can be a form of myocarditis, and that there was no reference in his report to sepsis.

¶ 46    Dr. Rolf Gobien, a diagnostic radiologist, testified that the CT images showed Jill had a tampon in her vagina. He acknowledged that autopsies did not mention the presence of a tampon.

¶ 47    With respect to Anderson and the nurses involved in Jill's care, Gerald Craig Felty, a registered nurse for 24 years, testified for plaintiff. He testified that Anderson should have performed an EKG, placed her on a cardiac monitor, and recorded certain vital sign readings during her care of Jill. From 2 a.m. to 4:31 a.m., on March 18, 2012, Anderson did not record certain measurements in Jill's record, including pulse, respiratory rate, and lung status, and she deviated from the standard of care when she did not do so. He opined that Anderson did not take measures to advocate on behalf of Jill.

¶ 48                              G. Defendants' Case

¶ 49    As previously discussed, defendants' theory was that Jill died of acute myocarditis. Defendants argued that there was no evidence of bacterial infection found on the autopsy reports and there was no identified infection site. Defendants contended that Woertz's MRSA finding from the postmortem blood sample was a contaminant that was introduced in Jill when she was coding and various lines were inserted. They argued that the "heterogenous density" indicated on the CT report was not a tampon. Defendants' experts testified that each health care provider met the standard of care and that Jill did not have sepsis or toxic shock syndrome.

¶ 50                             H. Defendants' Experts

¶ 51    Dr. Edward Ward, an emergency room physician, testified that it was his opinion that all the emergency medicine physicians complied with the standard of care. Jill died of myocarditis and she did not have sepsis or toxic shock syndrome. Jones complied with the standard of care with respect to his discussion with Jill before she left the hospital against his recommendation.

¶ 52    Ward testified that Heinrich's history and physical on Jill was complete and thorough and that he ordered all necessary tests and provided appropriate care. Heinrich's conclusion that Jill had viral gastroenteritis was "completely within the standard of care." Viral gastroenteritis was an "extraordinarily common" chief complaint, and the treatment includes evaluation, hydration, and following the patient over time.

¶ 53    Ward testified that the record did not show that Jones informed Jill that she had a life-threatening condition. He also testified that, based on the medical record, it did not appear that Jill had a life-threatening condition when she left the hospital. If Jones had suspected Jill had a pulmonary embolus, GI bleeding, sepsis, or any life-threatening condition, he should have explained his concerns and offered further testing. If Jones suspected that Jill had a life-threatening condition, then the standard of care would have required him to explain his concerns and offer further treatment. Jill left the hospital early, so Jones did not have the opportunity to do further testing. There was no evidence to support that Jones should have performed tests for sepsis, and she did not have symptoms consistent with toxic shock syndrome, including a documented fever, rash, or an infection site for bacteria. Ward testified that there were "a variety of different things that something could be at discharge" and that the standard of care did not require him "to go through each and every individual thing that may or may not be present."

¶ 54    Ward also testified that Connolly did not deviate from the standard of care as the physician in triage. Based on his review of Mercy's triage system and the responsibilities of the physician in triage, Connolly did not have to see Jill, as her time was divided between several areas. Her main role was to place orders on patients arriving in the emergency department to obtain information and expedite testing for the clinicians in the main emergency department.

Connolly appropriately ordered a CT scan, CMP, and CBC. It was appropriate for Connolly to rely on the triage nurse's assessment. Connolly was not notified of any issues relating to Jill when Jill was in the waiting room. If an EKG had been performed on Jill in triage or the waiting room, it would have shown Jill had an elevated heart rate, which was a finding that was already known at that point. There was no evidence in the record that Jill deteriorated in the waiting room.

¶ 55    Ward testified that, at 10 p.m. on March 17, 2012, Arwindekar, as the attending physician, became responsible for Rodriguez's care of Jill. Rodriguez did not do anything wrong with Jill when Arwindekar was supervising him. There was nothing on the CT scan suggesting Jill had a life-threatening condition. The CT report's finding that there was "heterogenous density" that should be correlated clinically did not require Arwindekar to perform a vaginal exam on Jill and would have been "highly unusual," as she had gastroenteritis. Arwindekar's history and physical exam and opinion that she had a viral illness met the standard of care. Arwindekar's decision to admit Jill to the hospital met the standard of care, and he was not required to transfer Jill to another section in the intensive care unit other than the observation unit.

¶ 56    Dr. Daniel Courtney, an emergency medicine physician, testified that the emergency medicine physicians who cared for Jill met the standard of care. Jill's underlying condition was viral gastroenteritis, a condition that gets better over time through the body's own immune process and should not be treated with antibiotics. The standard of care did not require the physicians to order antibiotics to treat a viral illness. Based on the record, there was nothing about Jill's condition that suggested she might have a condition that would cause an imminent death. He opined that Jill did not have toxic shock syndrome because she did not meet the CDC criteria for the syndrome. She did not have symptoms consistent with toxic shock syndrome, including a rash, fever, multiorgan failure, or hypotension.

¶ 57    It was Courtney's opinion that Jones met the standard of care with respect to his communication with Jill when she left the hospital against his recommendation. Asked if Jones was required to tell Jill she had a life-threatening condition, Courtney responded, "I don't think he thought that she had a life-threatening condition or knew or had any way to know that she had a life[-]threatening condition, so I would not say that he was required to say that to her." Based on his review of the records and laboratory findings, it was his opinion that Jill did not have a knowable life-threatening condition when she left the hospital. The record did not show evidence that Jones should have suspected that Jill had pulmonary embolism, a GI bleed, or sepsis. If Jones had suspected that Jill had a pulmonary embolism, GI bleed, or a life-threatening condition, the standard of care would have required him to tell Jill about these concerns before she left the hospital. There were no additional tests that Jones should have ordered before he spoke with Jill about leaving the hospital.

¶ 58    Dr. Robert Citronberg, a specialist in infectious disease, testified that Jill died of fulminant viral myocarditis, which meant "it came very quickly" and nothing could have been done to prevent her death. A virus can cause gastrointestinal symptoms. Jill did not have toxic shock syndrome because she did not have symptoms consistent with this condition, including a notable skin rash, low blood pressure, or high fever. There was no evidence in the record that Jill had a bacterial infection or sepsis. If she had bacterial sepsis, there would have been evidence of bacteria in one of her organs, which neither autopsy report identified. Before Jill

coded, her white blood count did not indicate a patient who had systemic bacterial infection, and her kidneys were functioning properly.

¶ 59    Citronberg testified that Woertz's autopsy report indicated that she died of myocarditis due to sepsis, which was based on the MRSA that grew out of the postmortem blood sample. Jill experienced nine different codes, and as such, bacteria could have been introduced to the surface of Jill's skin during these codes. It is uncommon for a patient with toxic shock syndrome to have bacteria in her blood. If Jill had MRSA in her blood when she was alive, that finding would argue against the theory that she had toxic shock syndrome, as MSRA only shows up in the bloodstream in about 5% of the patients with staphylococcal toxic shock syndrome.

¶ 60    Dr. Gary Schaer, an interventional cardiologist, testified that Jill had a severe viral infection that caused nausea, vomiting, and diarrhea, which ultimately caused her to die of very rare fulminant myocarditis, meaning that it was progressive and injured her heart acutely. There was nothing about Jill's presentation in the emergency department that would have suggested that she had an imminent cardiac emergency or viral myocarditis. There was also nothing to suggest that she had a severe bacterial infection because her white blood count analysis did not suggest she had an infection circulating in her bloodstream. There was nothing Jill's healthcare providers could have done to prevent her death.

¶ 61    Dr. Gregory M. Lewis, a cardiologist, testified that Jill died from a fulminant viral myocarditis. The autopsy reports showed no source of an infection or evidence that Jill's organs were damaged to raise the suspicion that she had a bacterial infection. The MRSA finding from Woertz's examination was most likely a contaminant that entered Jill's body when she was coding and experiencing various interventions. There was nothing the health care providers did or failed to do that contributed to her death.

¶ 62    Dr. Scott Denton, a forensic pathologist, testified that, based on his review of the microscope slides and autopsy reports, Jill died of acute myocarditis. Denton testified that the microscope slides and autopsy reports did not show evidence of bacteria and that Jill's coronary arteries were completely open, which was consistent with myocarditis. The clinical records showing gastritis was a preceding viral illness consistent with myocarditis. Denton saw no evidence of toxic shock syndrome because Jill did not have a rash, skin blotchiness, high fever, or source of MRSA.

¶ 63    Denton disagreed with Woertz's conclusion that Jill died of myocarditis due to bacterial sepsis. He disagreed because the autopsy reports showed no evidence of an infection, which must be present with a documented bacterial infection. He testified that results from postmortem microbiology, taking blood 24 hours after death, should be interpreted with caution. He opined that MRSA entered Jill's body when she was coding and being resuscitated, as there were various interventions that could have broken her skin and created areas for bacteria to enter her body. Based on the autopsy reports, it was Denton's opinion that Jill did not have a tampon in her body at the time of death. If a tampon had been present during the autopsy, it would have been normal practice to document that finding in the report.

¶ 64    Dr. Richard Gore, a diagnostic radiologist, testified that the CT scan did not show the presence of a tampon and there was no evidence that Jill had an infection. Vahid Yaghmai, a diagnostic radiologist, testified that Jill's CT scan did not show a tampon and that the image identified by plaintiff's experts as a tampon was Jill's urethra.

¶ 65     With respect to Anderson, Laurie Carrol, a registered nurse with 40 years of experience, testified that the nurses involved in Jill's care met the standard of care. She testified that there are certain situations when an emergency medicine nurse will assess a patient's vital signs and be aware of them but will not document them in the patient's chart. It would have been custom and practice for Anderson to have been aware of Jill's vital signs throughout her admission in the emergency room even when she did not document them. She testified that nurses and physicians communicate with each other frequently, especially in the emergency room, and that patient care takes precedence over making sure everything is documented in the medical record. Carroll testified that, at 1:59 a.m. on March 18, 2012, Anderson documented Jill's vital signs, which were within normal ranges. At 4:28 a.m., Anderson documented a transfer form, noting that Jill's condition was stable, which would indicate that Anderson performed an evaluation at that time. The standard of care did not require Anderson to place Jill on a cardiac monitor or perform an EKG.

¶ 66                                    I. Dr. Arthur Reingold

¶ 67     Dr. Arthur Reingold, a physician and professor of epidemiology at the University of California, Berkley, testified as an expert about toxic shock syndrome. Following medical school and residency, he worked for one year as an emergency medicine physician, after which he worked at the Centers for Disease Control (CDC) as a medical epidemiologist. In the 1970s and 1980s, there was a dramatic increase in toxic shock syndrome. In 1980, Reingold joined the CDC's toxic shock syndrome task force to study the disease. For five years, Reingold reviewed between 5000 and 10,000 patient records to determine whether the patient fit the CDC clinical criteria for toxic shock syndrome. Reingold was an author of over two dozen articles on toxic shock syndrome and had worked with the CDC on a contractual basis since 1988. Reingold explained that toxic shock syndrome is caused by an infection with staphylococcus aureus, a bacteria that produces a toxin and can get into the vagina through the insertion of a tampon. Reingold had not worked in a clinical setting treating patients since 1980.

¶ 68     Reingold testified that menstrual toxic shock syndrome in a woman in her forties was extremely rare because individuals develop antibodies and immunity. The incidence of women having toxic shock syndrome in 2012 was one in one million. Based on his review of Jill's medical records, his work at the CDC, and his background and experience with utilization of the CDC's toxic shock syndrome criteria over 38 years, it was Reingold's opinion that Jill did not have toxic shock syndrome and did not meet the CDC case criteria for toxic shock syndrome. The requirements for toxic shock syndrome included a documented fever of 102 degrees or greater, a rash, desquamation, which is a shedding of skin layers, low blood pressure, and multisystem organ failure. Jill did not have a documented fever of 102 degrees Fahrenheit or greater, rash, or desquamation, and she only had two isolated systolic blood pressure readings below the acceptable levels. He did not see that anything on Jill's autopsies that supported "multi-system involvement" showing she had toxic shock syndrome.

¶ 69     He testified that, in the early course of toxic shock syndrome, autopsy findings showed that people who died of toxic shock syndrome had normal hearts. On cross-examination, he acknowledged that the last time he examined a heart on a postmortem exam was in medical school. Asked whether he knew about any recent data regarding how a heart would appear on a postmortem exam with someone who died of toxic shock syndrome, he testified that he was

- 13 -

unaware of any recent findings but believed that the findings from the early years would still apply.

## J. Demonstrative Exhibit

¶ 71    Before Dr. Schaer testified, Mercy sought to use a demonstrative exhibit explaining that viruses can be airborne. Plaintiff objected, arguing that there was no evidence or testimony that Jill caught a virus from another person through an inhalation process. Defense counsel argued that the exhibit showed that Jill had a contagious virus, not that it was airborne. The court denied plaintiff's motion to prohibit the exhibit, noting that plaintiff's arguments were appropriate for cross-examination. Thereafter, during Schaer's testimony without objection from plaintiff, defense counsel introduced the exhibit and Schaer testified about the exhibit:

> "we have a patient who has a viral infection and many viruses spread from person to person via aerosol droplets. *** I believe that this unfortunate woman caught this viral infection, which initially presented with some flu-like symptoms *** and then began to also present most notably with severe abdominal pain, nausea, vomiting and diarrhea. So the virus initially involves some of the lungs *** and then the GI tract. "

## K. Blood Culture

¶ 73    When Jill was coding, the medical record showed that one of Jill's physicians, Dharanipragada, ordered "pan cultures," which included blood, urine, and sputum. The results of the order were not in the medical record nor presented at trial. According to plaintiff's expert, Noto, there was nothing in the record to show why there were no results of the blood culture or what happened to it. Noto testified that, had the blood culture that Dharanipragada ordered been analyzed, there would be an answer as to whether bacteria was in Jill's body before she died.

¶ 74    Defendants' expert Citronberg testified that, based on his review of the medical records, the blood culture order was discontinued and never sent to the laboratory. Citronberg also reviewed the deposition of Mercy's lab technician, Ruth Cryer. Cryer testified at her deposition that, if the laboratory did not receive a blood culture order, it would not do an analysis or generate a report. If an order is discontinued, that could mean the blood never made it to the lab, and it was possible the blood was never drawn.

## L. Jury Instructions

¶ 76    The court denied plaintiff's request to give IPI Civil No. 105.07.01, which is the instruction on informed consent, and IPI Civil No. 5.01, which relates to when a party fails to introduce evidence or a witness. The trial court also refused to give a nonpattern jury instruction on the loss of chance doctrine.

## M. Verdict and Posttrial Motions

¶ 78    The jury returned a verdict against plaintiff and in favor of all defendants. The trial court denied plaintiff's posttrial motion. This appeal followed.

¶ 79                                    II. ANALYSIS

¶ 80    On appeal, plaintiff contends that the trial court denied her a right to a fair trial and abused its discretion when it refused to give three jury instructions she requested: (1) IPI Civil No. 105.07.01, the instruction on informed consent, (2) IPI Civil No. 5.01, the instruction relating to missing evidence or witnesses, and (3) a nonpattern jury instruction on the loss of chance doctrine. Plaintiff further argues the trial court denied her a fair trial and abused its discretion when it permitted defendants' expert, Dr. Arthur Reingold, to testify and when it allowed Mercy to use a demonstrative exhibit showing an individual contracting an airborne disease from another individual. Lastly, plaintiff claims that the jury's verdict was against the manifest weight of the evidence because she had a right to have the jury instructed on the issues presented and the law to be applied.

¶ 81    Initially, we note that defendants assert in their response briefs that plaintiff violated Illinois Supreme Court Rule 341(b)(1) (eff. May 25, 2018) because her brief exceeds the page limit and the certificate of compliance did not state that the brief contained fewer than 15,000 words. However, after defendants filed their response briefs, plaintiff filed a "motion for leave to withdraw brief and for leave to file *instanter* a correct brief of plaintiff-appellant in excess of the page limit." We granted plaintiff's motion and allowed her to withdraw her initial brief, correct the certificate of compliance, and file a corrected brief in excess of the page limit.


¶ 82                        A. Illinois Pattern Jury Instructions

¶ 83    Plaintiff contends that the trial court denied her a right to a fair trial and abused its discretion when it refused to give IPI Civil No. 105.07.01, the jury instruction on informed consent, and IPI Civil No. 5.01, the jury instruction on failing to produce evidence or a witness.

¶ 84    Generally, "[a] party has a right to have the jury instructed on his or her theory of the case if the facts in evidence or a reasonable inference from those facts supports the theory." *Tsoukas v. Lapid*, 315 Ill. App. 3d 372, 377 (2000). A trial court must use an Illinois Pattern Jury Instruction when it is applicable unless the court determines that the instruction does not accurately state the law. *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 273 (2002). The trial court has discretion in determining which instructions to give the jury. *Luye v. Schopper*, 348 Ill. App. 3d 767, 773 (2004). We will not disturb the trial court's decision absent an abuse of discretion. *Id.* To determine whether the trial court abused its discretion, we will examine the jury instructions in their entirety, "to determine whether they fairly, fully and comprehensively informed the jury of the relevant law." *La Salle Bank, N.A. v. C/HCA Development Corp.*, 384 Ill. App. 3d 806, 813 (2008). However, when the issue is whether the jury instructions accurately stated the law, our review is *de novo*. *Doe v. Bridgeforth*, 2018 IL App (1st) 170182, ¶ 66.


¶ 85                    1. IPI Civil No. 105.07.01 Informed Consent—Duty
                          and Definition—Professional Negligence

¶ 86    Plaintiff's first argument on appeal is that a single-line reference to informed consent in the jury instructions did not sufficiently convey the legal principles to be applied to the evidence of a negligence claim based on informed consent. Rather, plaintiff contends, IPI Civil No. 105.07.01 should have been given to the jury. Defendants maintain that the trial court appropriately denied plaintiff's request for the jury to be given IPI Civil No. 105.07.01.

¶ 87    IPI Civil No. 105.07.01 states as follows:

"In providing medical [services] [care] [treatment] to [patient's name], a [insert appropriate medical professional] must obtain [patient's name]'s informed consent.

When I use the expression 'informed consent' I mean a consent obtained from a patient by a [insert appropriate medical professional] after the disclosure by the [insert appropriate medical professional] of those [risks of] [and] [or] [alternatives to] the proposed treatment which a reasonably well-qualified [insert appropriate medical professional] would disclose under the same or similar circumstances. A failure to obtain informed consent is professional negligence.

[The only way in which you may decide what (risks) (and) (or) (alternatives) the [insert appropriate medical professional] should have disclosed to [patient's name] is from expert testimony presented in the trial. You must not attempt to determine this from any personal knowledge you have.]"

¶ 88    The comments to the jury instruction state, "[t]his instruction differs from instructions based upon failure to obtain consent. Such actions are brought under a theory of battery. Informed consent is a negligence concept." IPI Civil No. 105.07.01, Comment. The notes on use also state that, "if the evidence shows that some other factor (*i.e.*, the relative benefits or lack of benefits of alternative treatments) should have been disclosed, then the instruction may be modified accordingly." IPI Civil No. 105.07.01, Notes on Use.

¶ 89    Plaintiff's proposed jury instruction No. 11 based on IPI Civil No. 105.07.01 stated as follows:

"The plaintiff claims that the defendant, Brett Jones, M.D. failed to inform Jill Milton-Hampton of the risks associated with pulmonary embolism, gastrointestinal bleed, infection and sepsis prior to being discharged the morning of March 17, 2012, which a reasonably careful emergency medicine physician would have disclosed under the same or similar circumstances;

The plaintiff further claims that if the defendant had disclosed those risks, a reasonable person in Jill Milton-Hampton's position would not have left the hospital the morning of March 17, 2012; and

The plaintiff further claims that Jill-Milton Hampton was injured, and that the defendant's failure to disclose the aforementioned risks was a proximate cause of her injury.

The defendant denies that he failed to inform the plaintiff of those risks which a reasonable careful emergency medicine physician would have disclosed under the same or similar circumstances; denies that Jill Milton-Hampton was injured and denies any failure to disclose risks was a proximate cause of any harm or injury."

¶ 90    In objecting to this instruction, the defense argued that it was "highlighting one particular physician with respect to a consent issue on a jury instruction that deals more with battery and the request of administering medication without consent. It doesn't apply. It's not applicable in this case." The trial court, in refusing to give the instruction, stated:

"I do think there's sufficient testimony about the—and there was testimony that the standard of care would have required the doctor to say certain things.

I agree with the defense. I don't think a separate instruction is appropriate, but I'll *** permit you to add 'failed to adequately inform her'—you work on the language.

- 16 -

***

So the objection—defendant's objection to Plaintiff's Proposed Jury Instruction No. 11 as a separate instruction is going to be sustained. The instruction will be refused.

However, I will permit the plaintiff to add a line item in the issues instruction to talk about informed consent, okay?"

¶ 91　The jury instructions given to the jury stated, in part: "plaintiff claims that [decedent] was injured and sustained damage, and that the defendants were negligent in one or more of the following respects: *** Dr. Brett Jones failed to inform [decedent] of the risks of leaving the hospital." Plaintiff maintains that it was error to give this one-line instruction on informed consent instead of the proposed instruction based on IPI Civil No. 105.07.01. We agree.

¶ 92　"The function of jury instructions is to convey to the jury the correct principles of law applicable to the submitted evidence and, as a result, jury instructions must state the law fairly and distinctly and must not mislead the jury or prejudice a party." (Emphasis omitted.) *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 507 (2002). The parties are entitled to have the jury instructed on the issues presented, the principles of law to be applied, and the necessary facts to be proven to support the jury's verdict. *Id.* at 505.

¶ 93　A plaintiff must prove four elements to prevail in a medical malpractice action under a theory of informed consent:

"(1) the physician had a duty to disclose material risks; (2) he failed to disclose or inadequately disclosed those risks; (3) as a direct and proximate result of the failure to disclose, the patient consented to treatment she otherwise would not have consented to; and (4) plaintiff was injured by the proposed treatment." (Internal quotation marks omitted.) *Crim v. Dietrich*, 2016 IL App (4th) 150843, ¶ 35.

¶ 94　Here, plaintiff submitted evidence on each of these four elements at trial. Plaintiff's expert, Dr. D'Ambrosio, testified that Jones had a duty to inform Jill of what could go wrong by leaving the hospital and that she could die. Defendant's expert, Dr. Ward, testified that, if Jones had suspected Jill had sepsis or a life-threatening condition, he should have explained his concerns and offered further testing. Defendant's expert, Dr. Courtney, testified that, if Jones had suspected that Jill had a pulmonary embolism, GI bleed, or a life-threatening condition, the standard of care would have required him to tell Jill about these concerns before she left the hospital. Jones acknowledged that he was concerned that Jill could have had certain life-threatening conditions, as he testified that sepsis was a condition that could be life-threatening and it was one of the "main possibilities" he was concerned about. He also testified that Jill's persistent tachycardia "throws up red flags for any emergency physician," as it could be a sign of a pulmonary embolism, a blood clot in the lungs, or gastrointestinal bleeding, which are all life-threatening conditions. The trial court seemingly agreed about the standard of care, stating, "I do think there's sufficient testimony about the—and there was testimony that the standard of care would have required the doctor to say certain things." Jones also acknowledged that, when he discharged Jill, he did not inform her that she could have a blood clot in her lungs, gastrointestinal bleeding, or sepsis. As a result, Jill went home and did not receive treatment or further testing to determine her condition, and she ultimately died.

¶ 95　Accordingly, the trial court should have allowed plaintiff to submit her informed consent instruction based on IPI Civil No. 105.07.01 which would require the jury to assess whether a "reasonably well-qualified" doctor would have disclosed to Jill the risks of leaving the hospital

under the same or similar circumstances. See IPI Civil No. 105.07.01. We emphasize that "[w]here IPI instructions accurately state the law applicable in a case and adequately charge the jury, they should be used exclusively." *Doe v. University of Chicago Medical Center*, 2014 IL App (1st) 121593, ¶ 80.

¶ 96 A plaintiff is entitled to have the jury instructed on his theory of the case, and the failure to do so may require a new trial. *Ellig v. Delnor Community Hospital*, 237 Ill. App. 3d 396, 405 (1992). A faulty jury instruction does not require reversal unless the error results in serious prejudice to the party's right to a fair trial. *Ramirez v. FCL Builders, Inc.*, 2014 IL App (1st) 123663, ¶ 164. To determine whether a party was prejudiced, we consider whether the instructions, taken as a whole, were sufficiently clear so as not to mislead the jury. *Ellig*, 237 Ill. App. 3d at 408.

¶ 97 Here, the trial court erred in giving the one-line instruction on informed consent, as it was an inaccurate statement of the applicable law. It did not explain the elements of informed consent, including Dr. Jones's duty to disclose material risks. This resulted in prejudice to plaintiff because it "denied [her] right to have the jury instructed on [her] theory of the case." *Doe*, 2014 IL App (1st) 121593, ¶ 88.

¶ 98 Defendants maintain that a separate informed consent instruction was not applicable because it "contemplates securing informed consent *** in order to perform a test or procedure on a patient," which is different from wanting a patient to stay in the hospital "for further assessment and observation." However, defendants do not cite any case law for this proposition, and we find none. IPI Civil No. 105.07.01 states that, in providing medical services, care, or treatment to the patient, the doctor must obtain informed consent, and the notes on use state that, "if the evidence shows that some other factor (*i.e.*, the relative benefits or lack of benefits of alternative treatments) should have been disclosed, then the instruction may be modified accordingly." IPI Civil No. 105.07.01, Notes on Use. This instruction applies here because plaintiff alleges that, in providing care to Jill, Jones did not disclose that leaving the hospital could result in grave injury or death. Plaintiff contends that, as a result, Jill was not informed of the material risks of leaving the hospital and therefore could not give informed consent prior to being discharged. We therefore disagree with defendants' contention that IPI Civil No. 105.07.01 should not have been given.

¶ 99 2. IPI Civil No. 5.01—Failure to Produce
Evidence or a Witness

¶ 100 Plaintiff argues that the trial court denied her a right to a fair trial and abused its discretion when it refused to give IPI Civil No. 5.01 with respect to the results of Jill's blood culture that was ordered when she was coding. She asserts that she established the necessary elements for the court to submit the missing evidence instruction to the jury, including that the results were under Mercy's control, the missing evidence was not equally available to her, Mercy would have produced the report if it was favorable to Mercy, and Mercy did not offer direct evidence to explain why the blood culture results were missing from the medical record.

¶ 101 A missing evidence instruction under IPI Civil No. 5.01 advises "the jury that, if a party fails to offer evidence that is within its power to produce, the jury may infer that this evidence would be adverse to that party." *Simmons v. Garces*, 198 Ill. 2d 541, 573 (2002). The court may give IPI Civil No. 5.01 when (1) the evidence was under the control of the party to be charged and could have been produced by reasonable diligence, (2) the evidence was not

- 18 -

equally available to both parties, (3) a reasonably prudent person under the same or similar circumstances would have produced the evidence if she believed the testimony was favorable to her, and (4) there was no reasonable excuse for the failure to produce the evidence. *Nassar v. County of Cook*, 333 Ill. App. 3d 289, 298 (2002). Thus, the instruction is warranted only if " 'there was no reasonable excuse for failure to produce the evidence.' " *Simmons*, 198 Ill. 2d at 573 (quoting *Brown v. Moawad*, 211 Ill. App. 3d 516, 531 (1991)). It is within the trial court's discretion to give IPI Civil No. 5.01, and its decision will not be disturbed absent an abuse of that discretion. *Nassar*, 333 Ill. App. 3d at 298-99.

¶ 102    Here, when the court denied plaintiff's request for IPI Civil No. 5.01, it stated that there was "evidence to suggest that these tests were ordered" but "no evidence to suggest,—or no firm evidence that they were ever completed." The court explained that "this is not a situation where he had the cultures drawn and tested and, somehow, someone lost the results, in which case the instruction would be more appropriate." We cannot find that the trial court abused its discretion when it refused plaintiff's request to give IPI Civil No. 5.01.

¶ 103    There was nothing in the record to show that Mercy possessed the blood culture results and failed to produce them. Rather, Mercy presented evidence that the blood culture order was not completed and, consequently, the blood culture results did not exist. The record showed that, when Jill was suffering multiple codes and the physicians were trying to resuscitate her, Dharanipragada ordered a blood culture. However, defendants presented evidence that this order was never completed, as Citronberg testified that the medical record showed that the blood culture order was discontinued, meaning it was never sent to the laboratory. When the blood culture was ordered, a "whole host" of other orders were also entered, and many of those orders were discontinued. This was not unusual because "all the attention diverts to managing the code and to keeping the patient alive" and "the secondary lab tests *** take a back seat to the more urgent ones." In fact, during argument on the instruction, plaintiff's counsel acknowledged that the order was never completed, as she stated, "[a]ll we know is that these were ordered and never done." Accordingly, the record shows that Mercy had a reasonable excuse for failing to produce the blood culture results, as the blood culture order was never completed and, consequently, the results did not exist.

¶ 104    Further, the record shows that Dharanipragada, who ordered the blood culture, was deposed. Plaintiff does not argue on appeal, and there is nothing in the record to show, that she was not equally available to plaintiff to call as a witness at trial. In addition, Mercy's lab employees, Ruth Cryer and Dean Christ, were also deposed before trial. There is nothing in the record to show that the deposition transcripts were not equally available to plaintiff.

¶ 105    Plaintiff was also not unfairly prejudiced because the court expressly stated that it would allow the parties to argue the evidence and whatever reasonable inferences one can conclude from the evidence. See *Simmons*, 198 Ill. 2d at 574 (concluding that court did not abuse its discretion when it refused Illinois Pattern Jury Instructions, Civil, No. 5.01 (3d ed. 1995) (hereinafter IPI Civil 3d) and noting that the plaintiffs "were not unfairly prejudiced, particularly in light of the fact that the court, while refusing the instruction, nevertheless allowed plaintiffs to argue whatever inferences they felt the jury should draw from defendant's failure to produce the record"). Accordingly, we cannot find that the trial court abused its discretion when it refused plaintiff's request to give the jury the instruction on missing evidence.

¶ 106                    B. Nonpattern Jury Instruction on Loss of Chance Doctrine

¶ 107     Plaintiff argues that the trial court denied her a right to a fair trial and abused its discretion when it refused to give her nonpattern jury instruction on the loss of chance doctrine. She argues she presented some evidence on every essential element of the doctrine.

¶ 108     We conclude that plaintiff was denied a fair trial when the trial court refused her instruction on the loss of chance. As previously discussed, "[a] party has a right to have the jury instructed on his or her theory of the case if the facts in evidence or a reasonable inference from those facts supports the theory." *Tsoukas*, 315 Ill. App. 3d at 377. Plaintiff presented sufficient evidence to support her loss of chance theory of recovery. Under the loss of chance theory, a plaintiff may establish proximate cause "when the evidence presented shows to a reasonable certainty that defendant's negligent delay in diagnosis or treatment lessened the effectiveness of the treatment." *Sinclair v. Berlin*, 325 Ill. App. 3d 458, 465-65 (2001). A plaintiff establishes a *prima facie* case when she presents "some" evidence on every essential element. *Hemminger v. LeMay*, 2014 IL App (3d) 120392, ¶ 17.

¶ 109     Here, plaintiff submitted sufficient evidence to support her theory that defendants Heinrich, Jones, Connolly, and Arwindekar's negligent delay in diagnosis or treatment lessened the effectiveness of Jill's treatment. Plaintiff's experts testified that Jill's history, symptoms, and certain test and laboratory findings in the emergency room were consistent with toxic shock syndrome and sepsis, which ultimately caused her death. However, defendants Heinrich, Jones, and Arwindekar diagnosed Jill with viral gastroenteritis, not sepsis, during her first two admissions in the emergency room.

¶ 110     D'Ambrosio testified that Heinrich and Jones should have suspected that Jill had an infection when Jill's symptoms did not improve after she received two liters of fluids. He testified that Jones and Heinrich should have ordered additional testing to look for sepsis. Jones acknowledged that he suspected sepsis could be one of the "main possibilities" but that he did not order additional testing for sepsis, inform Jill, or document this suspicion in the record. D'Ambrosio testified that Arwindekar should have taken note that the CT results showed fluid in her lungs, as that could indicate an infection, and that he should have ordered a sepsis workup. Further, plaintiff's experts testified that a tampon caused Jill's infection, which was identified as the "heterogeneous density" in the CT report. Arwindekar had the CT finding during the time he cared for Jill, and he did not take any measures to determine whether a tampon was present. D'Ambrosio testified that the standard of care required Arwindekar to admit Jill to a higher level of intensive care unit rather than the observation unit. D'Ambrosio testified that Connolly, as the physician in triage, should have ordered additional testing and should have sent Jill quickly back to the main emergency room. Jill waited in the waiting room for four hours before she was sent back to the main emergency department.

¶ 111     Plaintiff's experts testified that a patient has a better outcome if sepsis is treated early with antibiotics. Dr. Noto, who testified that his opinions were made with a reasonable degree of medical certainty, specifically testified that each hour of delay from the time a patient presents with sepsis to the time she receives antibiotics increases the risk of death by about 7%. He testified that Jill's risk of dying increased when the physicians did not diagnose her with sepsis or administer an early treatment of antibiotics. Drs. Hudson and Jacob, who also testified that their opinions were made with a reasonable degree of medical certainty, both specifically testified that, if Jill had received the proper course of treatment, it was more probably true than not that she would have survived. Accordingly, plaintiff submitted sufficient evidence to

support her loss of chance theory as it relates to her case against Heinrich, Jones, Connolly, Arwindekar, and EMP. However, plaintiff does not argue on appeal, and the record does not support, that she offered sufficient evidence to support her loss of chance theory against Anderson.

¶ 112    Plaintiff requested the court to submit a nonpattern jury instruction on the loss of chance, which stated as follows:

> "If you decide or if you find that plaintiff has proven that a negligent delay in the diagnosis and treatment of sepsis in Jill Milton-Hampton lessened the effectiveness of the medical services which she received, you may consider such delay one of the proximate causes of her claimed injuries or death."

We find that this instruction met the criteria for a nonpattern instruction, as it was simple, brief, impartial, and free from argument. See Ill. S. Ct. R. 239(a) (eff. Apr. 8, 2013). Thus, the trial court should have permitted plaintiff to submit her nonpattern jury instruction on the loss of chance, which would have required the jury to consider whether a negligent delay in the diagnosis and treatment of sepsis in Jill lessened the effectiveness of the medical services that she received and was one of the proximate causes of her death. However, the court denied her request and only gave the long-form proximate causation instruction based on IPI Civil No. 15.01, which stated as follows:

> "When I use the expression 'proximate cause,' I mean a cause that, in the natural or ordinary course of events, produced the plaintiffs [*sic*] injury. It need not be the only cause, nor the last or nearest cause. It is sufficient if it combines with another cause resulting in the injury."

We find that plaintiff was denied a fair trial when the court refused her instruction on loss of chance and only gave IPI Civil No. 15.01.

¶ 113    In reaching our conclusion, we recognize this court's previous opinion in *Cetera v. DiFilippo*, 404 Ill. App. 3d 20 (2010). There, the trial court, as here, instructed the jury on proximate causation using IPI Civil 3d No. 15.01 and refused the plaintiff's nonpattern jury instruction based on the loss of chance. *Cetera*, 404 Ill. App. 3d at 45. This court found that the trial court did not err, stating that this court has consistently affirmed a trial court's refusal to give a nonpattern jury instruction on the loss of chance because the proximate cause instruction provided in IPI Civil 3d No. 15.01 "properly states the law in lost chance medical malpractice cases." *Cetera*, 404 Ill. App. 3d at 45 (citing *Sinclair v. Berlin*, 325 Ill. App. 3d 458 (2001); *Lambie v. Schneider*, 305 Ill. App. 3d 421 (1999); *Henry v. McKechnie*, 298 Ill. App. 3d 268 (1998)). In finding no error, this court concluded that it found no reason to depart from our previous determinations. *Id.* We disagree.

¶ 114    Our supreme court has stated that, "[t]o the extent a plaintiff's chance of recovery or survival is lessened by the malpractice, he or she should be able to present evidence to a jury that the defendant's malpractice, to a reasonable degree of medical certainty, proximately caused the increased risk of harm or lost chance of recovery." *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 119 (1997). Thus, under *Holton*, a plaintiff may submit evidence and recover on a loss of chance theory. However, the Illinois Pattern Jury Instructions do not provide an instruction on the loss of chance doctrine. If we continue to follow *Cetera* and the cases that have found no error where a trial court gives IPI Civil No. 15.01 and refuses to give a nonpattern instruction on the loss of chance, a plaintiff may never be able to submit an instruction explaining a loss of chance theory to the jury. As laypersons, juries "are not trained

to separate issues and to disregard irrelevant matters. That is the purpose of jury instructions." *Dillon*, 199 Ill. 2d at 507. Thus, when a trial court refuses a loss of chance instruction, the jury is forced to understand a plaintiff's loss of chance theory argued at trial without an instruction to guide them on the law and how it should be applied to the general proximate causation concept described in IPI Civil No. 15.01. See *Dillon*, 199 Ill. 2d at 507 ("[t]he function of jury instructions is to convey to the jury the correct principles of law applicable to the submitted evidence"). Further, while a plaintiff may argue a loss of chance theory during argument, as here, the jury is instructed that arguments are not evidence, and therefore, the jury may not consider the theory when it considers the general proximate cause instruction in IPI Civil No. 15.01. However, if the trial court properly instructs the jury about the loss of chance theory, the theory will be properly before the jury, and the jury will likely give it more consideration.

¶ 115    We recognize that this court has previously held that the loss of chance theory is encompassed in the long-form proximate cause instruction in IPI Civil No. 15.01, which was given here. However, "jury instructions must state the law fairly and *distinctly* and must not mislead the jury or prejudice a party." (Emphasis in original.) *Dillon*, 199 Ill. 2d at 507. The proximate cause instruction in IPI Civil No. 15.01 provides that the cause "need not be the only cause, nor the last or nearest cause" but does not distinctly inform the jury about loss of chance, *i.e.*, that the jury may consider, as a proximate cause of a patient's injury, that a defendant's negligence lessened the effectiveness of the treatment or increased the risk of an unfavorable outcome to a plaintiff. See *Hemminger*, 2014 IL App (3d) 120392, ¶ 16 (loss of chance in medical malpractice is where the malpractice lessened the effectiveness of treatment or increased the risk of an unfavorable outcome).

¶ 116    Accordingly, because plaintiff submitted sufficient evidence to support her loss of chance theory and because she was entitled to have the jury instructed on her theory of the case, she was denied a fair trial when the court refused her instruction on loss of chance. Thus, we reverse and remand the case for a new trial against Jones, Heinrich, Connolly, Arwindekar, and EMP.

¶ 117    We note that plaintiff asserts in her reply brief that EMP "waived any arguments on this issue" because it did not object to plaintiff's proposed loss of chance instruction at the jury instructions conference. Generally, "[i]ssues not raised at trial are waived and cannot be argued for the first time on appeal." *Amalgamated Bank of Chicago v. Kalmus & Associates, Inc.*, 318 Ill. App. 3d 648, 658 (2000). However, this rule does not apply to defendants because an "[appellee] may raise for the first time on appeal any legal issue to defend her judgment for which there was a factual basis in the trial court." *Tuftee v. County of Kane*, 76 Ill. App. 3d 128, 134 (1979).

¶ 118                          C. Dr. Reingold's Testimony

¶ 119    Plaintiff asserts that the trial court erred when it allowed Reingold to testify as an expert because he was unqualified to testify about his opinion on the medical diagnosis, clinical condition, treatment of Jill, or conditions of Jill's heart on the postmortem exam. She asserts that, when the court allowed Reingold to testify and denied her motion *in limine* on this issue, it prejudiced her and resulted in an unfair trial.

¶ 120    Defendants assert that plaintiff forfeited her argument that she was denied a fair trial when the court denied her motion *in limine* and allowed Reingold to testify because she did preserve the issue by objecting at trial. "A ruling on a motion *in limine* is a determination addressing an

admissibility of evidence issue likely to arise at trial and is subject to reconsideration." *Sullivan-Coughlin v. Palos Country Club, Inc.*, 349 Ill. App. 3d 553, 561 (2004). "Whether granted or denied, a motion *in limine* itself does not preserve the issue for appellate review." *Id.* Rather, to preserve the issue for review, a party must object to the evidence at trial (*Schuler v. Mid-Central Cardiology*, 313 Ill. App. 3d 326, 333 (2000)) or make an offer of proof (*Sullivan-Coughlin*, 349 Ill. App. 3d at 561).

¶ 121 Here, plaintiff did not object to Reingold's testimony at trial when defendants called him as a witness. Plaintiff does not argue on appeal that she properly preserved her argument by objecting to Reingold's testimony at trial. We therefore find that plaintiff forfeited her argument that the court denied her a fair trial when it allowed Reingold to testify.

¶ 122 Nevertheless, even if we would find that plaintiff did not forfeit her argument, we would find that the trial court did not abuse its discretion. An individual is permitted "to testify as an expert if his experience and qualifications afford him knowledge that is not common to laypersons and where such testimony will aid the trier of fact in reaching its conclusions." *Unitrin Preferred Insurance Co. v. Dobra*, 2013 IL App (1st) 121364, ¶ 20. " 'There is no predetermined formula for how an expert acquires specialized knowledge or experience and the expert can gain such through practical experience, scientific study, education, training or research.' " *Thompson v. Gordon*, 221 Ill. 2d 414, 428-29 (2006) (quoting *People v. Miller*, 173 Ill. 2d 167, 186 (1996)). "An expert need only have knowledge and experience beyond that of an average citizen." *Id.* at 429. A trial court's ruling on a motion *in limine* and its decision to admit expert testimony are both reviewed under the abuse of discretion standard. *Davis v. Kraff*, 405 Ill. App. 3d 20, 28 (2010). The abuse of discretion standard is the most deferential standard of review and occurs when no reasonable person would agree with its decision. *Id.*

¶ 123 Here, Reingold testified as an expert on toxic shock syndrome and opined whether Jill met the criteria for the disease. With respect to Reingold's expertise and qualifications, Reingold testified that, following his medical training, he joined the CDC's task force on toxic shock syndrome in 1980, which was created as a response to the increase in toxic shock syndrome in the 1970s and 1980s. In this role, he studied the disease and reviewed between 5000 and 10,000 medical records to determine whether the patients fit the CDC's definition for toxic shock syndrome. He authored about two dozen articles on toxic shock syndrome and had studied infectious diseases for 38 years. Accordingly, we find there was sufficient evidence to support that Reingold had sufficient experience and knowledge to testify about toxic shock syndrome and that his testimony helped aid the jury in understanding the disease and symptoms.

¶ 124 Further, plaintiff's counsel cross-examined Reingold on the weaknesses in his experience, qualifications, sincerity, and soundness of opinion. See *Karn v. Aspen Commercial Painting, Inc.*, 2019 IL App (1st) 173194, ¶ 16 ("On cross-examination, counsel may probe an expert witness's qualifications, experience and sincerity, the weaknesses in the basis of his opinions, the sufficiency of his assumptions, and the general soundness of his opinion."). Thus, the jury heard about any weaknesses or insufficiencies in his qualifications and had the opportunity to assign weight to his testimony. See *id.* ¶ 21 ("The weight to be assigned to an expert opinion is for the jury to determine in light of the expert's credentials and the factual basis of his or her opinion."). Accordingly, we cannot find that the trial court abused its discretion when it permitted Reingold to testify.

¶ 125                        D. Defendants' Demonstrative Exhibit

¶ 126        Plaintiff argues that the trial court erred when it allowed Mercy to use a demonstrative exhibit to the jury during the testimony of one of its experts, Dr. Schaer. She asserts that the exhibit showed an individual contracting an airborne disease from another individual and that there was no testimony or evidence presented that Jill contracted her illness from an airborne contaminant.

¶ 127        Defendants assert that plaintiff forfeited her argument because she failed to timely object to the exhibit at trial. As previously discussed, the trial court's "denial of a motion *in limine* does not preserve an objection to disputed evidence later introduced at trial." *Grauer v. Clare Oaks*, 2019 IL App (1st) 180835, ¶ 95. To preserve an argument for review, the party asserting the objection must object contemporaneously when the evidence is offered at trial. *Id.* Although the party need not repeat an objection each time similar evidence is offered at trial, the party must object to the evidence the first time it is introduced. *Id.*

¶ 128        Here, the record shows that, during a conference on April 29, 2018, the parties discussed plaintiff's objections with certain demonstrative exhibits, including the exhibit at issue. However, during Schaer's testimony on May 1, 2018, plaintiff did not object when Mercy's counsel introduced the exhibit. Therefore, because plaintiff did not object contemporaneously when defendants offered the exhibit at trial, she failed to properly preserve her objection.

¶ 129        Nevertheless, even if we would find that plaintiff did not forfeit her objection, we would find that the trial court did not abuse its discretion when it allowed Schaer to testify about the demonstrative exhibit. Demonstrative evidence serves as a visual aid to the jury in comprehending the verbal testimony of a witness. *Cisarik v. Palos Community Hospital*, 144 Ill. 2d 339, 341 (1991). Demonstrative evidence is looked upon favorably by the courts because it allows the fact finder "to have the best possible understanding of the matters before it." *Sharbono v. Hilborn*, 2014 IL App (3d) 120597, ¶ 30. "The primary considerations in determining whether demonstrative evidence is admissible or may be used at trial are relevancy and fairness." *Yanello v. Park Family Dental*, 2017 IL App (3d) 140926, ¶ 31.

¶ 130        With respect to relevancy, the evidence " 'must actually be used to illustrate or explain the verbal testimony of a witness as to a matter that is relevant.' " *Id.* (quoting *Sharbono*, 2014 IL App (3d) 120597, ¶ 31). With respect to fairness, demonstrative evidence may still be excluded if " 'its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.' " *Id.* (quoting Ill. R. Evid. 403 (eff. Jan. 1, 2011)). The admission of an exhibit as demonstrative evidence is within the sound discretion of the trial court. *Kayman v. Rasheed*, 2015 IL App (1st) 132631, ¶ 66. A trial court abuses its discretion when the ruling is arbitrary, fanciful, or unreasonable or when no reasonable person would take the same view. *Id.*

¶ 131        Schaer testified that it was his opinion that Jill had a severe viral infection. He testified the virus caused nausea, vomiting, and diarrhea and ultimately injured her heart and caused fulminant myocarditis. During his testimony, Mercy's counsel used the demonstrative exhibit, which showed a diagram of how a virus can be transmitted from one individual to another individual through the air, causing the individual to experience flu-like symptoms, after which the virus attacks the GI system and then the heart. Schaer explained the exhibit:

        "we have a patient who has a viral infection and many viruses spread from person to person via aerosol droplets. *** I believe that this unfortunate woman caught this viral

infection, which initially presented with some flu-like symptoms *** and then began to also present most notably with severe abdominal pain, nausea, vomiting and diarrhea. So the virus initially involves some of the lungs *** and then the GI tract. *** Then the process that led to her heart's injury and ultimately to her death."

Thus, Schaer used the exhibit to explain his opinion that Jill caught a viral infection that attacked her GI tract and then damaged her heart, which caused death due to viral myocarditis. Accordingly, we cannot find that trial court's decision to allow Schaer to testify about the demonstrative exhibit was so arbitrary or unreasonable such that no reasonable person would agree with its decision. Thus, the trial court did not abuse its discretion.

¶ 132                              E. Jury's Verdict

¶ 133    Plaintiff lastly argues that the jury's verdict was against the manifest weight of the evidence. She argues that she had a right to have the jury instructed on the issues presented and principles of law to be applied and that the court denied her this right.

¶ 134    Having found reversible error with respect to the informed consent and loss of chance jury instruction issues, which relate to Jones, Heinrich, Connolly, Arwindekar, and EMP, we are remanding the case for a new trial against these defendants. Therefore, we need not address plaintiff's argument that the jury verdict against these defendants was against the manifest weight of the evidence.

¶ 135    Further, plaintiff only argues that the jury's verdict was against the manifest weight of the evidence because the court denied her the right to have jury instructions submitted on the issues presented and the law to be applied. Given our disposition that the jury instruction issues plaintiff raised do not relate to Anderson or Mercy, we cannot find that the jury's verdict finding against plaintiff and in favor of Anderson and Mercy was against the manifest weight of the evidence. Thus, we affirm the verdict in favor of Anderson and Mercy.

¶ 136                              III. CONCLUSION

¶ 137    The trial court erred when it refused to give plaintiff's proposed instruction on informed consent based on IPI Civil No. 105.07.01 and when it refused to give plaintiff's nonpattern instruction on the loss of chance doctrine. We reverse the jury's verdict finding against plaintiff and in favor of defendants Brett Jones, Scott Heinrich, Amit Arwindekar, Helene Connolly, and Emergency Medicine Physicians of Chicago, and remand for a new trial with respect to these defendants. We affirm the jury's verdict finding in favor of defendant Tara Anderson and Mercy Hospital and Medical Center and against plaintiff.

¶ 138    Affirmed in part and reversed and remanded in part.