2021 IL App (2d) 200414-U
No. 2-20-0414
Order filed May 28, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| DORIS MARTINEZ, Special Administrator of the Estate of Edward R. Suris, Deceased, | ) ) | Appeal from the Circuit Court of Lake County. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 17-L-476 |
| | ) | |
| HOLLY M. LOUD, D.O. and INFINITY HEALTHCARE PHYSICIANS, S.C., | ) ) | Honorable |
| | ) | Luis A. Berrones, |
| Defendants-Appellees. | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices McLaren and Hutchinson concurred in the judgment.

**ORDER**

¶ 1    *Held*: The Appellate Court affirmed the judgment where (1) the trial court properly instructed the jury as to proximate cause and (2) the trial court properly excluded a deputy coroner with no medical training from offering medical opinions; the deputy coroner's report was not a business record under 725 ILCS 5/115-5.1 (West 2018).

¶ 2    Plaintiff, Doris Martinez, special administrator of the Estate of Edward R. Suris, Deceased,

appeals the judgment of the circuit court of Lake County in favor of defendants, Dr. Holly M.

Loud, D.O. and Infinity Healthcare Physicians, S.C., following a jury trial. We affirm.

¶ 3                                   I. BACKGROUND

¶ 4    On October 29, 2019, plaintiff filed a second-amended complaint alleging causes of action against defendants for survival and wrongful death. These causes of action arose from the death of Edward R. Suris (Eddie) on July 3, 2015, after Dr. Loud discharged him from the emergency room at Advocate Condell Medical Center (Condell) in Libertyville, Illinois. Plaintiff alleged that Dr. Loud deviated from the standard of care by not recommending that Eddie be admitted to the hospital for monitoring of several underlying conditions. The following pertinent evidence was adduced at trial.

¶ 5                              A. Plaintiff's Case-In-Chief

¶ 6    Eddie was a 57-year-old man who lived with his mother, Eladia, and two adult nephews in Grayslake. He was a professional handyman who also played guitar in a band. Eddie was close to his immediate family and helped Eladia with household chores. Eddie also helped his neighbors with projects requiring his skills as a handyman. Eddie did not have a primary care physician, but several of his relatives were doctors, from whom he sought medical attention when he needed it. Eddie was up all night on July 2, 2015, in pain from a kidney stone. The next morning, Eddie presented himself in the emergency department at Condell, complaining of the pain.

¶ 7    Following Eddie's discharge from the emergency room at 1 p.m., he went home to bed. Eddie's nephew, Joshua, filled four prescriptions that Eddie was given in the emergency room. When Joshua put the pills and a glass of water on Eddie's nightstand at approximately 2 p.m., Eddie was snoring. Later that afternoon, Eladia checked on Eddie, discovered that his legs were cold, and covered him with a blanket. She noted that the pills and water were still untouched on the nightstand. At 4 p.m., Eladia checked on Eddie again and found that he had died. The family decided not to have an autopsy.

¶ 8            1. *Dr. Loud's Emergency Room Treatment and Discharge*

¶ 9    Dr. Loud testified under cross-examination in plaintiff's case-in-chief and then in direct examination in her own case. She saw Eddie in Condell's emergency room at 10:14 a.m. on July 3, 2015. Eddie complained of excruciating pain from a kidney stone. He reported that he had taken Vicodin and Ibuprofen. His symptoms were chills, nausea, and vomiting. Eddie's history included diabetes and high blood pressure. He was not experiencing chest pain or shortness of breath. Eddie was overweight at 350 pounds. Through a CT-scan, Dr. Loud confirmed the presence of a kidney stone.

¶ 10    In the emergency room, Eddie's blood pressure was 226/129, which Dr. Loud described as a "hypertensive crisis." Although, according to Dr. Loud, Eddie was not experiencing a hypertensive "emergency," as he had no neck pain, weakness, numbness, blurred vision, tingling, or vertigo. She also determined that he had no "end-organ" damage due to his high blood pressure. She testified that Eddie's skin was warm and dry and that he had no "ischemia," which is a lack of blood flow due to high blood pressure. Dr. Loud testified that lack of blood flow can produce a bluish discoloration in the legs, along with cool skin and lack of a pulse. According to Dr. Loud, Eddie's skin was normal.

¶ 11    Dr. Loud testified that she never looked at the deputy coroner's report or photographs that the deputy coroner took of Eddie's body. When plaintiff's counsel asked Dr. Loud about "ischemic changes" that were noted on the "coroner's examination body chart," defendants objected. The court sustained the objection based on lack of foundation for the coroner's report and photographs.

¶ 12    Although Eddie's blood pressure was coming down on its own as he sat in the emergency room, it remained high, so Dr. Loud administered Hydralazine to reduce it further. Dr. Loud also administered Dilaudid and Torodol for Eddie's pain. According to Dr. Loud, reducing the pain would help to reduce the blood pressure. Dr. Loud testified that she could safely reduce Eddie's

blood pressure by only 20% without risking a stroke. She did not know his baseline blood pressure. Eddie's last blood pressure reading, before Dr. Loud discharged him from the emergency room at 1 p.m., was 187/104. According to Dr. Loud, the Hydralazine would wear off in about six hours and Eddie's blood pressure would rise again. She testified that she expected Eddie to take the medications that she prescribed for him and to see the physician whom she recommended for follow-up long-term treatment.

¶ 13    Dr. Loud's diagnoses were kidney stone, diabetes mellitus, and hypertension. According to Dr. Loud, Eddie's diabetes and hypertension were asymptomatic. His oxygen level was normal. She did not recommend that Eddie be admitted to the hospital. Instead, she prescribed four medications and gave Eddie the name of a physician for a follow-up visit. Dr. Loud testified that it would take weeks or months to get Eddie's blood pressure to normal.

¶ 14    Dr. Loud testified that her treatment did not deviate from the standard of care. With respect to hypertension, Dr. Loud testified that symptoms such as severe chest pain, severe headache, confusion, blurred vision, and shortness of breath—none of which Eddie exhibited—would require hospitalization. She testified that Eddie had "chronic" elevated blood pressure that could be treated with medication as an out-patient.

¶ 15    Dr. Loud was aware that Eddie died shortly after she saw him in the emergency room. She testified that his heart stopped, and he stopped breathing, but, without an autopsy, she could not know why.

¶ 16                              2. *Plaintiff's Experts*

¶ 17    Dr. David Soo, a board-certified family physician, testified that Eddie should have been admitted to the hospital from the emergency room. Dr. Soo opined that admission to the hospital "with monitoring" would have increased or improved Eddie's chance of survival. According to

Dr. Soo, nurses in the hospital would have "picked up on a deviation from the heart rate, a blood pressure, [and] pulse oximetry." Dr. Soo testified that, if any of the monitors sounded an alarm, nurses would intervene immediately. On cross-examination, Dr. Soo acknowledged that, without an autopsy, he could not know what caused Eddie's death. Dr. Soo agreed that there could have been many causes of death for which monitoring would not have made a difference. According to Dr. Soo, even if Eddie had been hospitalized and monitored, he still might have died, because the cause of death was unknown. Dr. Soo agreed that Eddie was "stable" when he was discharged from the emergency room. Dr. Soo also acknowledged that Eddie could have been treated as an out-patient.

¶ 18   Dr. James Matthews, an emergency-medicine specialist, testified as plaintiff's second expert. He opined that Dr. Loud's treatment in the emergency room was "completely appropriate," but that she deviated from the standard of care in not recommending that Eddie be admitted to the hospital for "close monitoring" due to his "multiple issues." According to Dr. Matthews, hospitalization was required because of Eddie's untreated diabetes, morbid obesity, and "very severe" hypertension. Also, according to Dr. Matthews, July 3, 2015, was a Friday, and Eddie would find it difficult to be seen by a doctor. Additionally, Dr. Matthews noted that Eddie had fallen asleep in the emergency room. When Eddie fell asleep, due to the narcotics that he had been administered, he became "hypoxic," meaning that his pulse oxygenation, which was measured by a clip on the finger, fell below normal. In Dr. Matthews' opinion, hypoxia would be monitored, recognized, and treated if Eddie were in the hospital. According to Dr. Matthews, such monitoring would have prevented his death. Dr. Matthews opined that Eddie died because the drugs were still in his system when he went to sleep at home. The drug cocktail caused Eddie to become hypoxic,

and hypoxia caused a cardiac arrythmia, which caused his death. Dr. Matthews testified that he was not a pathologist and had never performed an autopsy.

¶ 19   On cross-examination, Dr. Matthews agreed that Eddie did not have symptomatic hypertension when he presented in the emergency room. Dr. Matthews agreed that neither hypertension, diabetes, nor the kidney stone caused Eddie's death. Dr. Matthews also agreed that Eddie's pulse oxygenation was normal when he was released from the emergency room. When defense counsel stated: "You are not sure of [Eddie's] cause of death because we don't have an autopsy, true?" Dr. Matthews answered: "I am not sure. *** I said no one else is sure either. I have an opinion, which I gave earlier."

¶ 20   On redirect examination, Dr. Matthews testified that Eddie should have been hospitalized to continue the administration of Hydralazine via a drip to manage his blood pressure.

¶ 21                    B. Defendants' Case-In-Chief

¶ 22                    1. *Dr. Gary Schaer, M.D.*

¶ 23   Dr. Gary Schaer, M.D., an interventional cardiologist who treats patients with hypertension, testified that Eddie had no heart-related problems when he presented at the emergency room on July 3, 2015. Dr. Schaer opined that Eddie's asymptomatic hypertension did not require hospitalization. According to Dr. Schaer, reducing Eddie's blood pressure gradually in the emergency room was appropriate. Dr. Schaer also opined that Eddie's diabetes could be controlled without hospitalization.

¶ 24   Dr. Schaer explained that "pulse oximetry" is a way to determine how much oxygen is in the bloodstream at a given moment. Dr. Schaer did not consider Eddie's oxygen levels in the emergency room to be abnormal. According to Dr. Schaer, Eddie did not require hospitalization to monitor his oxygen levels. In Dr. Schaer's opinion, the drugs that Dr. Loud administered in the

emergency room to treat Eddie's pain did not affect Eddie's oxygen levels. Dr. Schaer testified that the slight drop in Eddie's oxygen levels when he was in the emergency room was not evidence of hypoxia. According to Dr. Schaer, Eddie's heart was monitored continuously while he was in the emergency room, and his heart rhythms were normal.

¶ 25    Dr. Schaer testified that, without an autopsy, it was "pure speculation" whether admission to the hospital would have changed Eddie's outcome, because "we don't know why he died."

¶ 26                        2. *Dr. Mark Cichon, D.O.*

¶ 27    Dr. Cichon is a board-certified emergency room physician. He testified that Dr. Loud complied with the standard of care "in all aspects" of Eddie's treatment in the emergency room. Specifically, Dr. Cichon opined that Eddie did not require hospitalization because his hypertension and diabetes were asymptomatic and could be treated long-term as an outpatient. Dr. Cichon considered that Eddie did not have a primary care physician, but he noted that Eddie had family members who were doctors. He also noted that, if Eddie could not see a doctor over the holiday weekend, he could return to the emergency room.

¶ 28    With respect to Eddie's blood pressure, Dr. Cichon testified that Eddie did not present with an "acute" hypertensive or cardiac condition. Dr. Cichon testified that Eddie's cardiac examination was normal, even where his oxygen levels dipped twice, suggesting that the dips in oxygen could have been false results. According to Dr. Cichon, the laboratory tests showed no end-organ injury due to hypertension. Dr. Cichon also testified that Eddie's heart was monitored continuously while he was in the emergency room, with normal results. Dr. Cichon opined that nothing that occurred in the emergency room suggested that Eddie was at risk for a life-threatening arrythmia. Without an autopsy, Dr. Cichon did not know what caused Eddie's death. He testified that there was no

evidence that Eddie died from a "cardiac hypertensive event." Dr. Cichon opined that whatever triggered Eddie's death could have happened if he had been admitted to the hospital.

¶ 29     On cross-examination, Dr. Cichon testified that Eddie did not have ischemic changes to the skin on his legs. Dr. Cichon noted that the coroner's report, which was written by a nonmedical person, indicated such changes, but Dr. Cichon disputed that "that was occurring." Dr. Cichon also denied that hospitalization would have increased Eddie's chances of recovery. Dr. Cichon agreed that, although Eddie's blood pressure was trending down when he was released from the emergency room, it still would have been high when he died later that afternoon.

¶ 30     On redirect examination, Dr. Cichon testified that the changes noted postmortem on Eddie's legs were "stasis dermatitis," which is a darkening of the skin in people who have long-standing hypertension. He described the condition as "peripheral vascular disease." The doctor also opined that lividity was involved.

¶ 31                    C. The Deputy Coroner's Report

¶ 32     The court barred plaintiff's witness, Sarah Pendley, the Lake County coroner's deputy who handled Eddie's death, from testifying during plaintiff's case that she observed ischemic changes on Eddie's legs. At a sidebar conference outside the jury's presence, plaintiff's counsel represented that Pendley conducted the "coroner's examination" of the body and made handwritten notations on the coroner's report. Specifically, counsel stated that Pendley would testify that "she knows what ischemic changes look like and that's why she wrote ischemic changes" on a diagram in the coroner's report. Counsel stated: "[S]he's got the training and experience to do that." Counsel also represented that Pendley would identify the presence of ischemic changes on three postmortem photographs that she took the day after Eddie died.

¶ 33    Defense counsel argued that Pendley lacked any medical training or expertise and was not qualified to opine or imply that Dr. Loud missed identifying ischemic changes on Eddie's legs. Defense counsel argued that Pendley's job was to collect evidence. Defense counsel pointed out that Pendley did not see the body until a day after Eddie died. Defense counsel argued that Pendley could testify to her observations but not to her opinions or conclusions. Defense counsel also agreed that plaintiff could use the photographs showing what defense counsel termed "postmortem lividity," but, he argued, plaintiff had no expert who could opine as to the meaning of those photographs. Plaintiff's counsel responded that Pendley's lack of qualifications went only to the weight that the jury would give her evidence.

¶ 34    The court barred Pendley from testifying that the discoloration on Eddie's legs was due to ischemic changes. The court also barred the photographs because they lacked relevance, given that no one could testify that the discoloration depicted in the photographs was present when Dr. Loud examined Eddie.

¶ 35    After plaintiff rested, she made an "emergency" motion to reopen her case to introduce Pendley's report (but not the photographs) pursuant to section 115-5.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-5.1 (West 2018)), which provides that a certified copy of a coroner's protocol or autopsy report, or both, is admissible as an exception to hearsay. Specifically, the statute makes reports of a "medical" or "laboratory" examiner admissible as a business record. During the hearing on plaintiff's motion, which occurred outside the jury's presence, the court noted that Pendley was a former law enforcement officer who took a job as a deputy coroner. As such, the court ruled, her report did not qualify for admission into evidence under the statute.

¶ 36    Pendley's report was marked as Plaintiff's Exhibit No. 3. According to the report, Pendley observed Eddie's body at the funeral home the day after he died. Among other physical findings, Pendley noted "ischemic changes to the lower extremities." She also noted that Eladia reported that Eddie's legs were "starting to become very dry and scaly." Pendley's report contains a "body examination chart," consisting of drawings of front and back views of a male body. On the front view, Pendley darkened both lower legs and wrote "ischemic changes." The record also contains three color postmortem photographs of Eddie's bare legs. According to Pendley's report, these photographs were taken the day after his death. The left leg shows cherry red markings on the back of the leg from the knee down to the foot. The right leg shows cherry red markings on the front of the leg from just above the knee down to the toes.

¶ 37                                D. Jury Instructions

¶ 38                          1. *The Proximate Cause Instruction*

¶ 39    The court provided the jury with the short form of Illinois Pattern Jury Instructions, Civil, No. 15.01 (2011) (hereinafter IPI Civil (2011)), which advised the jury as follows: "When I use the expression 'proximate cause,' I mean a cause that, in the natural or ordinary course of events, produced the plaintiff's injury."

¶ 40    The court refused the long-form IPI Civil (2011) 15.01, which, in addition to the above, provided: "It need not be the only cause, nor the last or nearest cause. It is sufficient if it combines with another cause resulting in the injury."

¶ 41    Initially, plaintiff tendered the long form. However, after discussion with the court and defense counsel, during which the court noted that plaintiff was claiming only one cause of injury, that being Dr. Loud's failure to recommend hospitalization, plaintiff agreed to the short form.

¶ 42                          2. *Plaintiff's Non-IPI Instruction 9A*

¶ 43    Plaintiff tendered a non-IPI instruction on the lost chance doctrine,[1] as follows:

>    "If you find that the plaintiff has proven Holly Loud, D.O. should have recommended to Edward Suris that he be admitted into the hospital, and that the failure to recommend that he be admitted into the hospital deprived him of a chance to survive or recover from his health problem, you may consider this as one of the proximate causes of his death."

The court refused this instruction on the basis that the lost chance doctrine was covered by the proximate cause instruction.

¶ 44    After closing arguments and deliberation, the jury returned a verdict against plaintiff and in favor of defendants. The court denied plaintiff's posttrial motion, and plaintiff filed a timely notice of appeal.

¶ 45                                II. ANALYSIS

¶ 46    Plaintiff first contends that the court abused its discretion in refusing her non-IPI instruction on the lost chance doctrine. The function of jury instructions is to convey to the jury correct principles of law that are applicable to the submitted evidence. *Marsh v. Sandstone North, LLC*, 2020 IL App (4th) 190314, ¶ 35. For this reason, jury instructions must state the law fairly and distinctly and must not be misleading or prejudicial. *Marsh*, 2020 IL App (4th) 190314, ¶ 35. Pursuant to Illinois Supreme Court Rule 239(a) (eff. Apr. 8, 2013), whenever IPI Civil contains an

---

[1] The lost chance doctrine refers to the harm resulting to a patient when negligent medical treatment is alleged to have decreased the patient's chance of survival or recovery, or to have subjected the patient to an increased risk of harm. *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 98 (1997).

applicable instruction that accurately states the law, and the court determines that the jury should be instructed on the subject, the IPI instruction shall be used. When IPI Civil does not contain an instruction on a subject upon which the court determines that the jury should be instructed, the instruction on that subject should be "simple, brief, impartial, and free from argument." Ill. S. Ct. R. 239(a).

¶ 47    A trial court's decision to give or refuse an instruction is reviewed for abuse of discretion. *Marsh*, 2020 IL App (4th) 190314, ¶ 36. The standard for determining an abuse of discretion is whether the instructions, taken as a whole, are sufficiently clear so as not to mislead and whether they fairly and accurately state the law. *Marsh*, 2020 IL App (4th) 190314, ¶ 36. The reviewing court generally will not reverse for giving faulty instructions unless the instructions clearly misled the jury and resulted in prejudice. *Marsh*, 2020 IL App (4th) 190314, ¶ 37. A party forfeits its challenge to an instruction that was given unless he or she makes a timely and specific objection to the instruction and tenders an alternative, remedial instruction in its stead. *Marsh*, 2020 IL App (4th) 190314, ¶ 37.

¶ 48    Here, plaintiff argues that she presented evidence supporting her theory of lost chance of survival and that she was entitled to have the jury instructed accordingly. See *Tsoukas v. Lapid*, 315 Ill. App. 3d 372, 377 (2000) (a party has the right to have the jury instructed on her theory of the case where the facts in evidence, or a reasonable inference therefrom, supports the theory). Plaintiff contends that the jury was not adequately instructed on the theory of loss of chance where the court (1) rejected her non-IPI instruction and (2) gave the jury the short-form IPI Civil (2011) 15.01 on proximate cause.

¶ 49    In a medical malpractice case, the plaintiff must prove the following elements: (1) the proper standard of care against which the conduct of the defendant is measured, (2) an unskilled

or negligent failure to comply with the applicable standard of care, and (3) an injury proximately resulting from the defendant's want of skill or care. *Purtill v. Hess*, 111 Ill. 2d 229, 241-42 (1986).

¶ 50     Here, plaintiff's theory was that Dr. Loud decreased Eddie's chance of survival by failing to recommend that he be admitted to the hospital for monitoring. Under the "lost chance doctrine," a plaintiff can establish proximate cause by proving that the alleged negligence resulted in an injury in which the patient was deprived " 'of a chance to survive or recover from a health problem, or where the malpractice has lessened the effectiveness of treatment or increased the risk of an unfavorable outcome to the plaintiff.' " *Vanderhoof v. Berk*, 2015 IL App (1st) 132927, ¶ 61 (quoting *Holton v. Memorial Hospital*, 176 Ill. 2d 95, 111 (1997)). In *Holton*, our supreme court held that the lost chance doctrine comported with the traditional standard of proving causation in medical negligence cases. *Sinclair v. Berlin*, 325 Ill. App. 3d 458, 464 (2001).

¶ 51     In *Sinclair*, the court held that the long-form IPI Civil (2011) 15.01 proximate cause instruction encompasses the lost chance doctrine. *Sinclair*, 325 Ill. App. 3d at 467. The court so held because the lost chance doctrine is not a separate theory of recovery but is a "concept that enters into proximate cause analysis when a plaintiff alleges a defendant's negligent delay in diagnosis or treatment has lessened the effectiveness of treatment." *Sinclair*, 325 Ill. App. 3d at 467. Thus, the court determined that the trial court's refusal to give the plaintiff's non-IPI instruction on the lost chance doctrine did not deprive the plaintiff of a fair trial. *Sinclair*, 325 Ill. App. 3d at 467. *Sinclair* is consistent with extensive authority. *Cetera v. DiFilippo*, 404 Ill. App. 3d 20, 45 (2010) (the appellate court has consistently affirmed refusals of nonstandard lost-chance-doctrine instructions because "[IPI Civil (2011) 15.01] properly states the law in lost-chance medical malpractice cases").

¶ 52     Here, plaintiff argues that *Sinclair* is inapplicable because the court gave the short-form IPI Civil (2011) 15.01 on proximate cause. Plaintiff argues that the short form improperly instructed the jury that Dr. Loud's conduct must be the sole or only proximate cause of injury, whereas the long-form instruction provides that the lost chance need not be the only cause of harm.[2] As noted, the short form instructed the jury that "[w]hen I use the expression 'proximate cause,' I mean *a* cause that, in the natural or ordinary course of events, produced the plaintiff's injury." [Emphasis added].

¶ 53     Defendants argue that plaintiff forfeited this issue when she agreed to the short form instruction. A party forfeits its challenge to an instruction that was given unless he or she makes a timely and specific objection to the instruction and tenders an alternative, remedial instruction in its stead. *Marsh*, 2020 IL App (4th) 190314, ¶ 36; see also Ill. S. Ct. R. 366(b)(2)(i) (eff. Feb. 1, 1994) ("No party may raise on appeal the failure to give an instruction unless the party shall have tendered it")). Here, plaintiff initially tendered the long-form IPI Civil (2011) 15.01. However, after discussion among the court and the attorneys, plaintiff agreed to the short form. Plaintiff maintains that she agreed to the short form because she believed that the court would give her non-IPI instruction on the lost chance doctrine. She argues that, when the court rejected her non-IPI instruction, she again requested that the long-form IPI Civil (2011) 15.01 be given.

¶ 54     The record does not support plaintiff's position. The court and the parties agreed to the short form proximate cause instruction before the court considered plaintiff's non-IPI lost-chance

_____

[2] At oral argument, plaintiff conceded that the only proximate cause of Eddie's death in the record was testified to by Dr. Matthews, that being hypoxia that caused cardiac arrythmia, which caused death.

instruction, which was plaintiff's No. 9. The court indicated that it would take some time to think about No. 9. The next day, the court noted that it was giving the short form IPI Civil (2011) 15.01, and plaintiff's counsel said "Correct." Plaintiff's counsel then proposed an amendment to No. 9, so the court postponed discussion on it until the following day. The next day, the court again noted that it was giving the short form proximate cause instruction, and plaintiff's counsel again said "Correct." Plaintiff's counsel then withdrew No. 9 and tendered No. 9A in its stead, which was an amended non-IPI lost chance instruction. Defense counsel objected to No. 9A. The court found that the lost chance doctrine was covered in the short form IPI Civil (2011) 15.01 proximate cause instruction and refused No. 9A. Plaintiff's counsel did not thereafter retender the long form proximate cause instruction. Consequently, we agree with defendants that plaintiff forfeited this issue. Put another way, a party cannot complain of error which he induced the court to make or to which he or she consented. *McMath v. Katholi*, 191 Ill. 2d 251, 255 (2000).

¶ 55    Forfeiture aside, the court did not err in giving the short form proximate cause instruction. The reference in the short form to "a" cause adequately informs jurors that they are not limited to determining a single cause for the plaintiff's injury. *Hajian v. Holy Family Hospital*, 273 Ill. App. 3d 932, 941 (1995).

¶ 56    Next, plaintiff argues that the court abused its discretion in refusing her non-IPI lost chance instruction. Plaintiff relies on *Bailey v. Mercy Hospital & Medical Center*, 2020 IL App (1st) 182702, ¶ 112, in which the First District of the Appellate Court departed from the *Sinclair* line of cases and held that the plaintiff was entitled to a non-IPI instruction on the loss of chance.[3] We need not determine whether *Bailey* was correctly decided because it is distinguishable from our

---

[3] Our supreme court granted leave to appeal on March 24, 2021.

case. In *Bailey*, the decedent was treated in the emergency room but declined admission to the hospital for further observation when the emergency room physician recommended it. *Bailey*, 2020 IL App (1st) 182702, ¶ 18. Further, the plaintiff alleged that the emergency room doctors failed to diagnose and treat the decedent for toxic shock syndrome. *Bailey*, 2020 IL App (1st) 182702, ¶ 5. The plaintiff's experts testified that a patient has a better outcome if sepsis is treated early with antibiotics. *Bailey*, 2020 IL App (1st) 182702, ¶ 111. The plaintiff's expert pathologist testified that the decedent's cause of death was multiorgan failure due to shock from sepsis. *Bailey*, 2020 IL App (1st) 182702, ¶ 44. However, the Cook County medical examiner who performed the autopsy on the decedent concluded that the cause of death was acute and chronic congestive heart failure due to dilated cardiomyopathy. *Bailey*, 2020 IL App (1st) 182702, ¶ 32. The appellate court determined that the plaintiff's non-IPI instruction on the lost chance doctrine should have been given because it would have required the jury "to consider whether a negligent delay in the diagnosis and treatment of sepsis in [the decedent] lessened the effectiveness of the medical services she received and was one of the proximate causes of her death." *Bailey*, 2020 IL App (1st) 182702, ¶ 112.

¶ 57    In *Bailey*, there was evidence of more than one proximate cause of the decedent's death. Here, plaintiff argued strenuously at the instructions conference that there was only one proximate cause of death, that being Dr. Loud's failure to recommend hospitalization for monitoring.[4] While defendants in our case argued that, without an autopsy, the cause of Eddie's death was speculative, defendants' experts did not offer an alternative cause of death. Therefore, the jury in our case,

---

[4] At oral argument, plaintiff argued that the proximate cause was hypoxia, which led to cardiac arrythmia, which caused death.

unlike in *Bailey*, did not have to consider whether there was more than one proximate cause. Consequently, we determine that a separate instruction on lost chance was not necessary.

¶ 58    Plaintiff next contends that the court abused its discretion when it excluded Pendley's testimony and report. That evidence came up for discussion three times during the trial. The court first ruled that the coroner's report and photographs had to be in evidence before counsel could cross-examine Dr. Loud concerning them. The court further ruled that Dr. Loud could not furnish the necessary foundation because she testified that she had never seen those documents. However, plaintiff does not challenge the court's ruling as to foundation.

¶ 59    Rather, plaintiff argues that the court improperly excluded Pendley's testimony concerning her finding of ischemic changes on Eddie's legs and improperly excluded Pendley's report memorializing her finding. That issue arose when plaintiff called Pendley as a witness. Evidentiary rulings are within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *Serrano v. Rotman*, 406 Ill. App. 3d 900, 913 (2011). An abuse of discretion occurs only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the court. *Serrano*, 406 Ill. App. 3d at 913.

¶ 60    Here, with plaintiff's agreement, the court granted defendants' motion *in limine* to bar lay witnesses from testifying to medical opinions. Plaintiff asserts that Pendley was a fact witness who, because of her position as a deputy coroner, could testify to her observation of "ischemic" changes on Eddie's legs. Defendants argue that plaintiff failed to preserve Pendley's testimony in an offer of proof. To preserve error in the exclusion of evidence, an offer of proof is usually necessary, and if not properly made, will result in the forfeiture of any alleged error. *Scaggs v. Horton*, 85 Ill. App. 3d 541, 546 (1980). The necessity of an offer of proof depends upon the circumstances of the particular case. *Scaggs*, 85 Ill. App. 3d at 546. If required, the offer of proof

must show what the proof offered is, or what the expected testimony will be, by whom or how it was made, and what its purpose is. *Scaggs*, 85 Ill. App. 3d at 546. If it is obvious that a witness is competent to testify to a certain fact, and it is obvious what the witness's testimony will be if he or she is permitted to give it, a formal offer of proof is unnecessary, and counsel's statement will suffice. *Scaggs*, 85 Ill. App. 3d at 546.

¶ 61    The content of Pendley's proposed testimony is discernible from the record. Plaintiff offered Pendley to testify that she observed ischemic changes and that she took the photographs purporting to show those changes. The record, however, is somewhat murky with respect to Pendley's qualifications. The record shows that Pendley was a former law enforcement officer who became a deputy coroner. We can infer from the record that Pendley had no medical training. We, thus, conclude that a formal offer of proof, while preferable, was unnecessary.

¶ 62    The record does not support plaintiff's assertion that Pendley was offered as a mere fact witness. The court did not bar Pendley from testifying to her observations. Rather, the court barred Pendley from offering her opinion that the discoloration on Eddie's legs was due to "ischemic" changes. That is a medical opinion, as Dr. Loud explained that such changes are caused by a medical condition. Plaintiff's counsel grasped that distinction, because, when the court ruled that Pendley could testify to her observations only and to the factual contents of her report, counsel replied, "Not interested." With respect to Pendley's photographs, not only could she, as a lay witness, not offer the opinion that the discoloration depicted therein was due to ischemic changes, the photographs depicted Eddie's postmortem condition, not his condition when Dr. Loud examined him.

¶ 63    Furthermore, Pendley's opinion of ischemic changes was placed before the jury during Dr. Cichon's testimony. On cross-examination, plaintiff's counsel asked Dr. Cichon whether he saw

evidence of ischemic changes as noted in the "coroner's report." Dr. Cichon testified that someone had written "ischemic changes" on the diagram in the coroner's report. However, Dr. Cichon testified: "I dispute that."

¶ 64 Plaintiff further argues that Pendley's report was admissible pursuant to section 115-5.1 of the Code, which provides that the records of the coroner's "medical or laboratory examiner summarizing and detailing the performance of his or her official duties in performing medical examinations upon deceased persons or autopsies, or both," which are kept in the ordinary course of business and certified by the coroner, are admissible as *prima facie* evidence of the "facts, findings, opinions, diagnoses and conditions" stated therein. 725 ILCS 5/115-5.1 (West 2018)). This issue arose when plaintiff moved to reopen her case to admit Pendley's report.

¶ 65 We first note that Pendley performed neither a "medical examination" nor an "autopsy" on Eddie's body. According to her report, Pendley gathered information concerning the facts surrounding Eddie's death, and then she noted the body's general outward appearance as it lay naked at the mortuary. She photographed the body in that state. Second, we note that Pendley is neither a "medical" examiner, meaning a physician (see 55 ILCS 5/3-3014 (West 2018) (a medical examination or autopsy shall be conducted by a physician duly licensed to practice medicine in all its branches, and wherever possible by one having special training in pathology) nor a "laboratory" examiner, such as a toxicologist or biologist who examined bodily fluids of the deceased. The trial judge recollected that Pendley is a former police officer. It is undisputed that she has no formal medical training. Accordingly, we determine that the court did not err in excluding Pendley's report.

¶ 66                                   III. CONCLUSION

¶ 67 For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 68    Affirmed.